COMMISSION ON MEDICAL DISCIPLINE OF THE
STATE OF MARYLAND *v.* IRVING M.
STILLMAN

[No. 113, September Term, 1980.]

\* \* \*

IRVING M. STILLMAN *v.* COMMISSION ON MEDICAL
DISCIPLINE OF THE STATE OF MARYLAND

\* \* \*

IN THE MATTER OF IRVING M. STILLMAN

[No. 18, September Term, 1981.]

*Decided October 9, 1981.*

The causes were argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Henry R. Lord* and *Michael C. Powell* for Irving M. Stillman.

*Jack C. Tranter* and *Susan K. Gauvey, Assistant Attorneys General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for Commission on Medical Discipline of the State of Maryland.

*Amicus curiae* brief of The Medical and Chirurgical Faculty of Maryland filed, *Angus R. Everton, E. Dale Adkins, III* and *Anderson, Coe & King* on the brief.

MURPHY, C. J., delivered the opinion of the Court.

We deal here in a single opinion with three separate but related appeals involving the revocation of Dr. Irving Stillman's license to practice medicine by the Commission on Medical Discipline (the Commission), a governmental agency established pursuant to Maryland Code (1957, 1980 Repl. Vol.) Art. 43, § 130, as a part of the State Department of Health and Mental Hygiene. Number 113 presents the question whether an order of the Baltimore City Court staying the Commission's revocation of Dr. Stillman's license pending judicial review is appealable and, if so, whether the stay order violated the provisions of Art. 43, § 130 (m), the separation of powers and due process provisions of the Maryland Declaration of Rights, or the due process clause of the fourteenth amendment to the federal con-

stitution. Primarily at issue in No. 18 (two appeals in one record) is whether Art. 43, § 130 (a), which provides for appointment of the membership of the Commission, violates state and federal constitutional provisions respecting the delegation of governmental authority to a private organization.

## I

The Commission is authorized by Art. 43, § 130 to investigate complaints of unprofessional conduct on the part of Maryland physicians. Under § 130 (b), the Commission is empowered to promulgate rules and regulations "for the proper supervision and control of the professional conduct of all persons under its jurisdiction . . . ." Under § 130 (g), the Commission is enjoined to refer complaints of unprofessional conduct to "the appropriate local county [medical] society or committee of the Medical and Chirurgical Faculty of the State of Maryland, for investigation and report." The subsection requires that the report "contain recommendations the investigation reveals may be necessary for adequate disciplinary procedures." Section 130 (j) provides for hearing before the Commission of charges of unprofessional conduct entered against a physician. Section 130 (h) enumerates with specificity the types of "unprofessional conduct" with which a physician may be charged, and authorizes the Commission to either dismiss the charges, issue a reprimand, place the physician on probation, or revoke or suspend his license.

At the time of the proceedings in this case, § 130 (a) delineated the membership of the Commission as follows:

> The president of the Medical and Chirurgical Faculty of the State of Maryland.

> Two practicing physicians appointed by the Secretary of Health and Mental Hygiene, selected from a list submitted by the Medical and Chirurgical Faculty of the State of Maryland, such list, having been composed from a list of nominees

submitted by component societies of the Medical and Chirurgical Faculty and two other licensed practicing physicians of the State of Maryland appointed by the Secretary of Health and Mental Hygiene.

Three members of the Board of Medical Examiners to be selected by the Secretary of the Department of Health and Mental Hygiene.

The chairman of the council of the Medical and Chirurgical Faculty of the State of Maryland.[1]

The Medical and Chirurgical Faculty is a private, voluntary membership organization constituting, in effect, the State Medical Society.

## II

The Commission initiated its investigation of Dr. Stillman's professional conduct as a result of newspaper accounts of his arrest on charges of committing a sexual offense involving a female patient. Although Stillman was acquitted of the charges after a jury trial, the Commission, pursuant to § 130 (g), directed the Peer Review Committee of the Medical and Chirurgical Faculty (the State Medical Society) to investigate Stillman's professional conduct. On November 27, 1978, the committee filed its report with the Commission, indicating that Stillman was professionally incompetent in a number of designated particulars. On September 5, 1979, the Commission charged Stillman with professional incompetence and scheduled a hearing to consider the charges. Prior to the hearing, Stillman, on February 11, 1980, filed a declaratory judgment action in the Circuit Court of Baltimore City, seeking to enjoin the Commission from holding the hearing and to obtain a declaration that the Commission could not constitutionally proceed with the hearing. It was Stillman's primary

1. Two lay consumer members were added to the Commission by ch. 702 of the Acts of 1980.

contention that Art. 43, § 130 (a) was unconstitutional because it constituted an impermissible delegation to the State Medical Society, a private, non-governmental body, of the power to make appointments to the Commission. The court (Kaplan, J.), finding no merit in the contention, declined to enjoin the scheduled hearing, and declared that § 130 (a) was in all respects constitutional. Stillman appealed to the Court of Special Appeals. We granted certiorari (No. 18) prior to decision by that court to consider the important issues raised in the case.

The hearing on the disciplinary charges against Stillman was concluded on April 29, 1980. The Commission thereafter issued an order dated May 20, 1980 revoking Stillman's medical license for professional incompetence.[2] The Commission's order provided that the revocation would be effective on June 20, 1980 in order to afford time for Dr. Stillman to transfer his patients to the care of another physician. The order also provided that if Stillman entered a Commission-approved training program, the license revocation would be stayed and he would be placed on conditional probation. Stillman appealed to the Baltimore City Court and filed a motion to stay the Commission's order. Over the Commission's objection, the court (Karwacki, J.) stayed the order revoking Stillman's license pending judicial review by the Baltimore City Court. The Commission appealed to the Court of Special Appeals but that court, on September 2, 1980, dismissed the appeal on the ground that it was not taken from an appealable final judgment. We granted the Commission's petition for certiorari to review the intermediate appellate court's dismissal of the appeal (No. 113).

On February 10, 1981, the Baltimore City Court (Perrott, J.) affirmed the Commission's order revoking Stillman's

---

2. The Commission found that Stillman's medical records were inadequate; that his prescription practices were medically unacceptable; that he used laboratory tests inappropriately; that his medical care did not reflect an orderly, thoughtful and logical approach to medical diagnosis and treatment; that his knowledge and clinical skills were medically unacceptable; and that care provided to sixteen specified patients was not medically acceptable.

license. Stillman appealed to the Court of Special Appeals. We granted certiorari (No. 18) and consolidated all three cases for briefing and argument.

## III

The Commission contends that Judge Karwacki's order staying the revocation of Dr. Stillman's license in effect enjoined its judgment and therefore constituted an appealable interlocutory order under Maryland Code (1974, 1980 Repl. Vol.), § 12-303 (c) (1) of the Courts and Judicial Proceedings Article. That section provides, *inter alia,* that a party may appeal an order "granting . . . an injunction . . . ." We agree with the Commission. Where, as here, the Court restrains the action of an executive branch agency revoking the license of a physician, the order in effect permits the physician to continue to practice his profession and constitutes an order in the nature of an injunction.[3] *See Laje v. R. E. Thomason Gen. Hospital,* 564 F.2d 1159 (5th Cir. 1977), *cert. denied,* 437 U.S. 905 (1978); *Cahokia Sportservice, Inc. v. Illinois Liq. Con. Comm'n,* 32 Ill. App. 3d 801, 336 N.E.2d 276 (1975).

## IV

### (A)

Contrary to the conclusion reached by the Baltimore City Court, § 130 (m) plainly precludes a court from staying a Commission order revoking or suspending a medical

---

**3.** After the Baltimore City Court, on February 10, 1981, affirmed the Commission's order revoking Dr. Stillman's license, the stay expired and Stillman was forced to withdraw from practice. Whether the stay order was appealable is therefore a moot issue. We nevertheless consider the issue because of its extreme importance and the certainty that the issue is one of a recurring nature. *See* Attorney Gen. v. A. A. Co. School Bus, 286 Md. 324, 407 A.2d 749 (1979).

license.[4] The section provides that where judicial review of such an order is sought,

> "the revocation or the period of suspension shall not be stayed and shall be effective or commence to run immediately, except this shall not apply to any decision made prior to July 1, 1974, in which case the revocation or suspension shall be stayed until final judgment."[5]

As a matter of statutory construction, therefore, the Baltimore City Court erred in interpreting § 130 (m) to permit a stay of the Commission's order revoking Stillman's license.[6]

## (B)

Stillman argues that the legislative prohibition contained in § 130 (m) against judicial stays of Commission orders revoking medical licenses violates the separation of powers provision contained in Article 8 of the Maryland Declaration of Rights. That article provides:

> "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

---

4. The court, expressing concern that a literal interpretation of § 130 (m) might render the statute unconstitutional, held that a stay was permissible notwithstanding the clear statutory language to the contrary.

5. By ch. 8 of the Acts of 1981, the legislature comprehensively revised Maryland statutes dealing with health occupational laws. The substance of § 130 (m) was revised to read, under the heading "Administrative and judicial review . . . *Stay of decision*," "An order of the Commission may not be stayed pending review." *See* Md. Code (1981) § 14-508 of the Health Occupations Article.

6. Prior to July 1, 1974, § 130 (m) provided that a Commission order revoking a medical license was automatically stayed pending judicial review. This provision was in contrast to Maryland Rule B6 a, governing the procedure on appeal of a decision of an administrative agency, which specifies that the filing of an appeal does not act as an automatic stay, but that the court may, in its discretion, grant a stay. Rule B6 a is not applicable in the present case in view of the post-1974 provisions of § 130 (m).

In *Attorney General v. Waldron,* 289 Md. 683, 689, 426 A.2d
929, 933 (1981), we said that Article 8

> "has been consistently interpreted from its
> inception
>
> > to parcel out and separate the powers of
> > government, and to confide particular classes of
> > them to particular branches of the supreme
> > authority. That is to say, such of them as are
> > judicial in their character to the judiciary; such
> > as are legislative to the legislative, and such as
> > are executive in their nature to the executive.
> > Within the particular limits assigned to each,
> > they are supreme and uncontrollable."

(Quoting *Wright v. Wright,* 2 Md. 429, 452 (1852)). The
judicial branch of government in this State possesses those
powers expressly reserved to it by the Maryland
Constitution and Declaration of Rights. In addition, the
judiciary has certain implied or inherent powers under the
Maryland Constitution. The breadth of these powers was
described by the Supreme Court of Wisconsin in *State v.
Cannon,* 196 Wis. 534, 221 N.W. 603, 603-604 (1928), quoted
with approval in *Waldron*:

> "In order to accomplish the purposes for which they
> are created, courts must also possess powers. From
> time immemorial, certain powers have been
> conceded to courts, because they are courts. Such
> powers have been conceded, because without them
> they could neither maintain their dignity, transact
> their business, nor accomplish the purposes of their
> existence. These powers are called inherent powers.
> * * *
>
> 'The inherent power of the court is the power to
> protect itself; the power to administer justice . . .;
> the power to promulgate rules for its practice; and
> the power to provide process where none exists. It is
> true that the judicial power of this court was
> created by the Constitution, but, upon coming into

being under the Constitution, this court came into being with inherent powers.'"

(Quoting *In re Bruen,* 102 Wash. 472, 172 P. 1152 (1918)).

Along similar lines, the Supreme Court of Minnesota, in *Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners,* 308 Minn. 172, 241 N.W.2d 781 (1976), said that inherent judicial power

> "grows out of express and implied constitutional provisions mandating a separation of powers and a viable judicial branch of government. It comprehends all authority necessary to preserve and improve the fundamental judicial function of deciding cases.

> \* \* \*

> "The test to be applied in these cases is whether the relief requested by the court or aggrieved party is necessary to the performance of the judicial function as contemplated in our state constitution. *The test is not relative needs or judicial wants, but practical necessity in performing the judicial function. The test must be applied with due consideration for equally important executive and legislative functions." Id.* at 786 (footnote omitted; emphasis added).

The inherent power at issue in the present case is the power to administer justice. A corollary of this power is a court's inherent power to review administrative actions for arbitrariness, illegality, capriciousness, or unreasonableness. The separation of powers doctrine mandates that the legislature may not divest the judiciary of these inherent powers. *See Attorney General v. Waldron, supra; Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 331 A.2d 55 (1975); *Heaps v. Cobb,* 185 Md. 372, 45 A.2d 73 (1945).

Stillman advances two distinct separation of powers arguments. First, he contends that the power to issue a stay is itself an inherent power of the judiciary that may not be circumscribed by the legislature. Second, he argues that the inability to issue a stay pending judicial review divests the judicial branch of its inherent authority to review administrative actions for arbitrariness, illegality, capriciousness and unreasonableness.

The power to issue a stay is not an inherent judicial power in the sense that it may never be limited or denied by legislative enactment. A stay is simply a tool that a court may use in the proper exercise of its authority. The power to stay administrative action is only inherent in the sense that it is a traditional power that equity courts could utilize without express statutory authorization. *See Fooks' Executors v. Ghingher,* 172 Md. 612, 192 A. 782, *cert. denied,* 302 U.S. 726, 58 S. Ct. 47, 82 L. Ed. 561 (1937).

By enacting § 130 (m), the legislature limited the jurisdiction of the courts by prohibiting stays of Commission orders revoking medical licenses. *See* Md. Const. Art. IV, § 20.[7] This exercise of legislative authority did not of itself violate the separation of powers doctrine because the power to stay administrative action pending judicial review is not an essential power inherent in the courts in the discharge of their constitutionally mandated duty to administer justice. Stillman's separation of powers argument, therefore, must rise or fall on his contention that the prohibition on stays impermissibly precludes the courts from subjecting administrative action to judicial review for arbitrariness, illegality, capriciousness or unreasonableness — a recognized inherent judicial power.

---

**7.** This constitutional provision now states in subsection a:

"(a) There shall be a Circuit Court for each County and for Baltimore City. The Circuit Courts shall have and exercise, in the respective counties, and Baltimore City, all the power, authority and jurisdiction, original and appellate, which the Circuit Courts of the counties exercised on the effective date of these amendments, and the greater or lesser jurisdiction hereafter prescribed by law."

In *Criminal Inj. Comp. Bd. v. Gould, supra,* we reviewed a statutory scheme providing for awards of monetary compensation by an administrative agency to victims of crime. The statute provided that only the Attorney General (and not the claimant) could seek judicial review of a decision rendered by the agency. We held that this statutory provision was constitutional, concluding that although a claimant had no right to judicial review under the statute, the legislature had not intended to preclude the judiciary from exercising its inherent power to review administrative action alleged to have been arbitrary, illegal, capricious or unreasonable.

In *St. Dept. of A. & Tax. v. Clark,* 281 Md. 385, 380 A.2d 28 (1978), taxpayers sought judicial review of their real property assessment under Maryland Code (1957, 1975 Repl. Vol.), Art. 81, § 67, which permitted designated officials to decrease or abate an assessment after the date of finality in order to correct an error or to prevent injustice. The remedy under § 67 could be invoked by a taxpayer whether or not the assessment had been appealed in accordance with the regular statutory procedure for challenging an assessment's validity. The taxpayers successfully argued before the lower court that notwithstanding the absence of express statutory authority to appeal from the § 67 determination, the court nevertheless had jurisdiction to review it under its inherent power to review administrative action for arbitrariness, illegality, capriciousness, or unreasonableness. We reversed, holding:

> "The key to the right of a court to utilize inherent powers to prevent illegal, unreasonable, arbitrary or capricious administrative action is that 'the legislature has not expressly provided for judicial review.' If reasonable judicial review has been provided there is no '*untrammelled* right arbitrarily to grant or withhold that which is derived from the people.'

* * *

> "... The plain teaching of *Gould* is that the inherent power of a court to review an administrative agency's determination is not unbridled. It may not be utilized when the statutory right of judicial review is available. That right did not exist under the Criminal Injury Compensation Act applicable in *Gould,* and, in fact, was expressly precluded. It was fully available under the applicable statute in the instant case. Section 67 cannot be isolated from the other provisions of Art. 81. It must be considered in the light of those sections which provide, as of right, review of the determination of each successive administrative agency, step by step, under administrative procedures, and then review by the courts of the final assessing authority's action. Under such a comprehensive scheme, we see no infirmity in the absence of judicial review of the potential extraordinary relief held out by § 67. That relief ... is a matter of grace. When a taxpayer permits an assessment to become final, he can only hope that he may obtain relief under § 67. If relief is denied him or if the relief granted does not meet his expectations, he is entitled to nothing further at that time." *Id.* at 399, 402, 380 A.2d at 37, 38.

Stillman argues that a court cannot effectively exercise its inherent power to review administrative action unless it can stay the agency's determination pending judicial review. This argument, however, overlooks our holding in *Clark.* A final decision of the Commission is subject to judicial review, Art. 43, § 130 (p), in accord with the provisions of the Administrative Procedure Act. *See Comm'n on Med. Discipline v. Bendler,* 280 Md. 326, 373 A.2d 1232 (1977); Art. 41, § 255 (a). All actions taken by the Commission, if appealed, are therefore expressly subject to judicial review, and the Commission's decision is subject to reversal or modification under Art. 41, § 255 (f). *Clark* held that when reasonable judicial review is provided for by statute, the

statutory method of review is exclusive and a court may not exercise its inherent powers to review administrative agency determinations. Similarly, we now hold that because reasonable judicial review of Commission decisions is provided for by statute, the § 130 (m) prohibition on stays pending judicial review does not encroach upon the judiciary's inherent power to review administrative action for arbitrariness, illegality, capriciousness and unreasonableness. *See Scripps-Howard Radio v. Federal Communications Comm'n,* 316 U.S. 4, 62 S. Ct. 875, 86 L. Ed. 1229 (1942) (implicitly recognizing that Congress could prohibit stays of administrative action pending judicial review); *State ex rel. Smith v. Circuit Court,* 231 Ind. 173, 108 N.E. 2d 58 (1952) (court had no jurisdiction to stay revocation of driver's license pending judicial review when statute prohibited stays); *Yacht Club Catering v. Bruckman,* 276 N.Y. 44, 11 N.E.2d 345 (1937) (recognizing legislature's power to limit stay of agency's revocation of liquor license pending judicial review). We thus conclude that § 130 (m) does not violate the separation of powers doctrine contained in Article 8 of the Maryland Declaration of Rights.

Stillman also attacks § 130 (m) on due process grounds, arguing that the prohibition on stays pending judicial review violates the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights.

The right to practice medicine is a property right of which a physician cannot be deprived without due process of law. *Aitchison v. State,* 204 Md. 538, 105 A.2d 495, *cert. denied,* 348 U.S. 880, 75 S. Ct. 116, 99 L. Ed. 692 (1954). In that case, however, we noted that the right is subject to the paramount police power of the state:

> "[N]o person has an absolute vested right to practice medicine, but only a conditional right which is subordinate to the police power of the State to protect and preserve the public health. *Reetz v. People of State of Michigan,* 188 U. S. 505, 23 S. Ct. 390, 47 L. Ed. 563. The State, in the performance of

its duty to protect and preserve the public health, has the power, within constitutional limitations, to regulate the practice of medicine by those engaged therein. This regulatory power is justified by the fact that the practice of medicine requires special knowledge, training, skill and care, that health and life are committed to the physician's care, and that patients ordinarily lack the knowledge and ability to judge his qualifications."
*Id.* at 544, 105 A.2d at 498.

In *Flynn v. Board of Registration in Optometry,* 320 Mass. 29, 67 N.E.2d 846 (1945), an optometrist whose license had been suspended by the Board of Registration argued that he had been denied due process of law because the applicable statute, which covered disciplinary actions against physicians as well as optometrists, prohibited courts from staying the Board's orders pending judicial review. The Supreme Judicial Court of Massachusetts found no merit in the contention, stating:

"We cannot say that it is a deprivation of fundamental rights if the right to a stay is withheld during the interval of time between a decision of the board and the entry of a decree of the court in the event a review is sought. We reach this conclusion the more readily because of the many safeguards in the statute ensuring an adequate hearing in the first instance before the board. The Legislature may have thought that the professions and callings to which this statute was applicable were such that the public health, safety, and welfare might be protected better if a stay were forbidden."
*Id.* at 34, 67 N.E.2d at 849-50.

*Accord, State v. State Board of Medical Examiners,* 68 Nev. 455, 235 P.2d 327 (1951) (statute prohibiting stay of agency action revoking a physician's license did not violate due process).

In Maryland, due process challenges to legislative enactments are to be evaluated under the following standards:

> "The test for constitutionality under the Due Process Clause is whether a statute, as an exercise of the state's police power, bears a real and substantial relation to the public health, morals, safety, and welfare of the citizens of this state. . . . The exercise by the Legislature of the police power will not be interfered with unless it is shown to be exercised arbitrarily, oppressively or unreasonably. . . . The wisdom or expediency of a law adopted in the exercise of the police power of a state is not subject to judicial review, and the law will not be held void if there are any considerations relating to the public welfare by which it can be supported. . . . Such a statute carries with it a strong presumption of constitutionality. . . ."
> *Bowie Inn v. City of Bowie,* 274 Md. 230, 236, 335 A.2d 679, 683 (1975) (citations omitted).

Stillman, in order to overcome the presumption that § 130 (m) is constitutional, must demonstrate that the prohibition on stays pending judicial review does not bear a real and substantial relationship to the health, safety, and welfare of the citizens of Maryland.

The legislature was undoubtedly aware of two important interests when it enacted § 130 (m). Physicians whose licenses have been properly suspended or revoked for unprofessional conduct pose a clear threat to the public health. On the other hand, preventing physicians from practicing medicine while awaiting judicial review could have a devastating effect on their ability to resume practice in the event that they prevail on appeal. Section 130 (m) may well have resulted from the legislature's belief that the negative effect on physicians whose licenses are suspended or revoked improperly was outweighed by the harm that might befall the public if any of the physicians sanctioned by the Commission were permitted to continue practicing

pending judicial review. Indeed, those physicians who are merely placed on probation or reprimanded are not precluded from obtaining a stay under the statute. Thus, it is only when the potential threat to the public is the greatest that the legislature has seen fit to preclude judicial stays. We think § 130 (m) does bear a real and substantial relationship to the public health, safety, and welfare of the people of this State and does not constitute a denial of due process, particularly in light of the various statutory safeguards governing Commission proceedings. Consequently, we conclude that the legislature has exercised its police power in a permissible manner.

## V

As heretofore indicated, § 130 (a) expressly provides that the president and the chairman of the council of the Medical and Chirurgical Faculty shall be members of the Commission. In addition, the subsection provides that three members of the Board of Medical Examiners — a board whose members are appointed by the Medical and Chirurgical Faculty (see Art. 43, § 120) — shall be appointed to the Commission by the Secretary of the Department of Health and Mental Hygiene. Section 130 (a) further provides that two physicians be appointed to the Commission by the Secretary from a list submitted to him by the Medical and Chirurgical Faculty. Under the statute, therefore, a majority of the Commission membership is composed of physicians who are either officers of the Medical and Chirurgical Faculty or whose eligibility for membership on the Commission is subject to that private organization's control.

Stillman urges that the statute violates the separation of powers provisions of Article 8 of the Declaration of Rights because it removes "the Governor's right to make executive branch appointments," presumably in contravention of Art. II, § 1 of the Maryland Constitution which vests the "executive power of the State ... in a Governor."

Article II, § 10 of the Maryland Constitution provides:

> "[The Governor] shall nominate, and, by and with
> the advice and consent of the Senate, appoint all
> civil and military officers of the State, whose
> appointment, or election, is not otherwise herein
> provided for, *unless a different mode of
> appointment be prescribed by the Law creating the
> office.*" (Emphasis supplied.)

A provision of the Maryland Constitution of 1851 (Art. II,
§ 11), identical to Article II, § 10 of our present constitution,
was considered by the Court in *Davis v. State,* 7 Md. 151
(1854), and *Baltimore v. State,* 15 Md. 376 (1860). In *Davis,*
the question was whether, under this constitutional
provision, the legislature could provide for appointment to
an office created by statute. Concluding that it could, the
Court said:

> "[W]e think this provision [Art. II, § 11] means,
> simply, that the Governor shall have the power to
> fill all offices in the State, whether created by the
> Constitution or by Act of Assembly, unless
> otherwise provided by the one or the other. When,
> therefore, the legislature has created an office by
> Act of Assembly, the legislature can designate by
> whom and in what manner the person who is to fill
> the office shall be appointed."
> *Id.* at 161.

In *Baltimore,* the Court reconciled the interpretation in
*Davis* with the separation of powers provision contained in
the Declaration of Rights. In answer to the contention that
the power of appointment was "an intrinsic executive
function," beyond the legislature's authority, the Court
observed:

> "[T]he Legislature makes the laws, the Judiciary
> expounds them, and the Governor sees that they are
> faithfully executed .... It does not follow, as a
> necessary conclusion, that, in order to perform this

duty, [the Governor] must have agents of his own nomination. Our form of government, in its various changes, has never recognized this power as an executive prerogative." 15 Md. at 456.

The Court in *Baltimore* said that the Constitution "so far from treating ... [the appointment power] as an inherent executive power, indicates that it belongs where the people choose to place it." *Id.* at 457. Addressing the separation of powers question, the Court concluded:

> "In considering the question as to separation of the departments, we are to bear in mind that the Declaration of Rights is not to be construed by itself, according to its literal meaning; it and the Constitution compose our form of government, and they must be interpreted as one instrument. . . . The former announces principles on which the government, about to be established, will be based. If they differ, the Constitution must be taken as a limitation or qualification of the general principle previously declared, according to the subject and the language employed."
> *Id.* at 459 (citation omitted).

In *Anderson v. Baker*, 23 Md. 531 (1865), the Court considered a provision of the Maryland Constitution of 1864 which was also identical to Art. II, § 10 of our present Constitution. In holding that the legislature could constitutionally provide for appointment to an office created by it, notwithstanding the separation of powers provision of the Declaration of Rights, the Court said:

> "The Act in question, creating the office, does prescribe a different mode of appointment. Where the office is of legislative creation, the Legislature can modify, control or abolish it, and within these powers is embraced the right to change the mode of appointment. *Davis v. State*, 7 Md. 161.
>
> "As to the supposed conflict between the Constitution of Maryland and the Bill of Rights, as

it is called, such a collision can scarcely occur, according to the accepted theory of the relation between these instruments. In representative constitutional governments, they are understood to be parts of a whole, constituting an entirety, and to be interpreted as one instrument. The Declaration of Rights is an enumeration of abstract principles, (or designed to be so,) and the Constitution the practical application of those principles, modified by the exigencies of the time or circumstances of the country. "If they differ, the Constitution must be taken as a limitation of the principle previously declared, according to the subject and the language employed.' *Baltimore v. State,* 15 Md. 459.

"The Declaration of Rights is a guide to the several departments of government, in questions of doubt as to the meaning of the Constitution, and 'a guard against any extravagant or undue extension of power,' but does not control the Constitution itself, when it is clear and unambiguous." 23 Md. at 627-28.

In *Scholle v. State,* 90 Md. 729, 46 A. 326 (1900), the Court interpreted Art. II, § 10 of the present Maryland Constitution in accordance with the holding in the *Davis, Baltimore,* and *Baker* cases. It is thus clear that when the legislature creates an office by statute, as it did in § 130 (a), the separation of powers provision of Article 8 does not of itself prevent the legislature from placing the power of appointment in the hands of someone other than the Governor. As stated in *Scholle,* when the legislature has created an office by statute, it "can designate by whom, and in what manner the person who is to fill the office shall be appointed." 90 Md. at 743. Relying upon *Scholle,* the Court in *McCurdy v. Jessop,* 126 Md. 318, 95 A. 37 (1915), upheld a statute requiring the Baltimore County Commissioners to appoint as game warden the candidate nominated by a private hunting and fishing organization. The viability of *Scholle* was reaffirmed by the Court in *Price v. Clawns,* 180 Md. 532, 25 A.2d 672 (1942). We need not probe the limits

of the *Scholle* doctrine in this case, for we are satisfied that placing the appointment authority in the Medical and Chirurgical Faculty, a professional organization chartered by the General Assembly of Maryland by ch. 105 of the Acts of 1798, does not offend the separation of powers provision of the Maryland Declaration of Rights.

Stillman characterizes the Medical and Chirurgical Faculty as "essentially a privately selected, self-regulating board, largely beyond the meaningful scrutiny of any State agency, including the courts." He contends that the provisions of § 130 placing the power to discipline physicians in the hands of this private organization constitute an impermissible delegation of legislative power in violation of the Maryland Constitution and Articles 4 and 6 of the Declaration of Rights.[8]

A similar argument was before the Court in *Scholle v. State,* 90 Md. 729, 46 A.2d 326 (1900). In that case, Scholle was convicted of practicing medicine without having obtained a license from the Board of Medical Examiners. He challenged the constitutionality of the statute regulating the practice of medicine on the ground that it impermissibly authorized a private organization — the Medical and Chirurgical Faculty — to appoint all members of the licensing board, thereby unlawfully committing the execution of the statute to a non-governmental body. The Court held that the legislature, in regulating the practice of medicine, was empowered to create a Board of Medical Examiners to test the qualifications of applicants. The Court concluded that no delegation of the legislature's lawmaking powers was involved in designating the Medical and Chirurgical Faculty as an agent of the State, to perform acts

---

8. Article 4 provides:

"That the People of this State have the sole and exclusive right of regulating the internal government and police thereof, as a free, sovereign and independent State."

Article 6 provides, in part:

"That all persons invested with the Legislative or Executive powers of Government are the Trustees of the Public, and, as such, accountable for their conduct . . . ."

of a public character in appointing the members of the licensing body.

Stillman contends that *Scholle* has been implicitly overruled by subsequent decisions invalidating the delegation of legislative power to private interest groups. We do not agree. The rule in Maryland is well established. In the enactment of laws, the legislature acts in the exercise of a power conferred upon it by the people; it cannot validly redelegate its lawmaking authority to others. *Board v. Attorney General,* 246 Md. 417, 229 A.2d 388 (1967); *Md. Co-Op. Milk Producers v. Miller,* 170 Md. 81, 182 A. 432 (1935); *Brawner v. Supervisors,* 141 Md. 586, 595, 119 A. 250 (1922). In examining the validity of a delegation of power from the legislature, we have adopted a standard as set forth, for example, in *Gino's v. Baltimore City,* 250 Md. 621, 640, 244 A.2d 218 (1968), where we stated:

> "When legislative power is *delegated* to administrative officials it is constitutionally required that adequate guides and standards be established by the delegating legislative body so that the administrative officials, appointed by the executive and not elected by the people, *will not legislate,* but will find and apply facts in a particular case in accordance with the policy established by the legislative body." (Emphasis in original.)

In *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 218-219, 334 A.2d 514 (1975), the Court, after noting that the legislature may delegate powers, described the proper role of an administrative agency receiving the legislature's delegated power: "after being provided with general rules and standards [for guidance]," it has the duty to make factual determinations and apply the standards in specific cases. *See also Governor v. Exxon Corp.,* 279 Md. 410, 440, 370 A.2d 1102 (1977), *aff'd,* 437 U.S. 117, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978); *Sanza v. Md. Board of Censors,* 245 Md. 319, 334-35, 226 A.2d 317 (1967); Oppenheimer, *Administrative Law in Md.,* 2 Md. L. Rev. 185, 199 (1938). Because this case

involves an area of public health, we note that even more flexible standards of control over an administrative agency are permitted than in other areas of legislation. *Truitt v. Board of Public Works,* 243 Md. 375, 387, 221 A.2d 370 (1966); *Givner v. Commissioner of Health,* 207 Md. 184, 191, 113 A.2d 899 (1955), and cases therein cited.

Section 130 of Art. 43 clearly provides sufficient standards delineating powers of the Commission so as to constitute a valid delegation of power from the legislature. The statute sets forth at length the composition of the Commission, its powers to discipline physicians for specific acts of misconduct, the procedures to be followed during the investigative process, and the right to appeal from any action taken by the Commission. Although members or designees of the Medical and Chirurgical Faculty may constitute a majority of the Commission membership, neither body is free to enact its own legislation governing physicians in Maryland. Thus, § 130 does not impermissibly delegate the legislature's lawmaking power to the Commission or to the Medical and Chirurgical Faculty.

## VI

Stillman next argues that his right to practice medicine was arbitrarily terminated by the Commission, in violation of both federal and state constitutional due process provisions,[9] by a private, special-interest organization, *i.e.,* the Medical and Chirurgical Faculty which, by its control

---

**9.** The Due Process Clause of the Fourteenth Amendment provides:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Maryland Declaration of Rights, Art. 24 provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

These constitutional provisions have long been equated. *See, e.g.,*

over the Commission membership, he contends, actually controls the disciplining of physicians in Maryland. Stillman suggests that because he is not a member of the Medical and Chirurgical Faculty, its members or designees serving on the Commission, were inherently prejudiced against him, and he was thereby deprived of his due process right to a fair and impartial hearing. He relies upon *Gibson v. Berryhill,* 411 U.S. 564, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973).

In *Gibson,* charges of unprofessional conduct were brought before the Alabama Board of Optometry against various optometrists because of their employment with a commercial optometry corporation. Both the organization filing the charges and the Board itself were composed entirely of optometrists in private practice. The trial court found as a fact that the Board intended to revoke the licenses of all optometrists employed by corporations and that this would benefit the private practices of the members of the Board. The Supreme Court, in affirming the trial court's disqualification of the Board, stated:

> "It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. ... The District Court proceeded on this basis and, applying the standards taken from our cases, *concluded that the pecuniary interest of the members of the Board of Optometry had sufficient substance to disqualify them, given the context in which this case arose.* As remote as we are from the local realities underlying this case and it being very likely that the District Court has a firmer grasp of the facts and of their significance to the issues presented, we have no good reason on this record to

Pitsenberger v. Pitsenberger, 287 Md. 20, 27, 410 A.2d 1052, *appeal dismissed,* 449 U.S. 807, 101 S. Ct. 52, 66 L. Ed. 2d 10 (1980); Governor v. Exxon Corp., 279 Md. 410, 423, 370 A.2d 1102 (1977), *aff'd,* 437 U.S. 117, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978).

overturn its conclusion and we affirm it." 411 U.S. at 579 (emphasis supplied).

It is plain that *Gibson* did not hold, as Stillman suggests, that the commercial optometrists were deprived of due process of law solely because they did not belong to the same professional organization as the members of the Board that imposed sanctions upon them. This point is more clearly indicated in *Friedman v. Rogers,* 440 U.S. 1, 99 S. Ct. 887, 59 L. Ed. 2d 100 (1979). In that case, Rogers, a commercial optometrist who was also a member of the Texas Optometry Board, challenged the constitutionality, on equal protection and due process grounds, of a statute that required that four out of the six members of the Board belong to a professional organization which commercial optometrists were ineligible to join. After stating that no disciplinary proceedings had been instituted against Rogers, the Court distinguished *Gibson,* noting that in that case the Court was "able to examine in a particular context the possibility that the members of the regulatory board might have personal interests that precluded a fair and impartial hearing of the charges." *Id.* at 18. Moreover, the Court observed that because the private optometrists' organization had long supported the provisions of the Professional Responsibility Rule for optometrists, a rule later enacted into law by statute,

> "it was reasonable for the legislature to require that a majority of the Board be drawn from a professional organization that had demonstrated consistent support for the rules that the Board would be responsible for enforcing." *Id.*

It is clear from *Friedman* and *Gibson* that Stillman cannot successfully contend that he was deprived of due process merely because members of the Commission were members of a private medical society which he had not joined. Although the economic competition between commercial optometrists and optometrists with private practices described in *Gibson* evidently also existed in Texas, the Supreme Court in *Friedman* stated that it was reasonable

that a majority of the members of the state regulatory board were required to belong to the professional organization of one faction of the profession. The record before us does not contain any evidence of similar economic competition in Maryland between physicians belonging to the Medical and Chirurgical Faculty and those like Stillman who do not. Stillman does not contend, and the record fails to reveal, that any of the members of the Commission would personally benefit from the revocation of his license. In addition, the Medical and Chirurgical Faculty has had a long tradition of overseeing the medical profession in Maryland since it was first authorized by the legislature in 1798 to select a Board of Medical Examiners to license physicians. *See Scholle, supra; University of Md. v. Williams,* 9 G. & J. 365 (1838).

Stillman next contends that he was denied due process because of a lack of "meaningful review of the Commission's actions by a court." Although § 130 (p) provides for judicial review of the Commission's decisions, Stillman maintains that to provide sufficient safeguards to adequately supervise the actions of the Commission, the appeal from the Commission's decision must in essence be a de novo review with an independent evaluation of all relevant evidence.

In *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 334 A.2d 514 (1975), we declared a statute unconstitutional because it provided for a de novo appeal from the decision of an administrative agency. The proper role for a court reviewing the actions of an administrative agency was, we said:

"to see that these responsibilities were properly empowered to the agency and have been performed within the confines of the traditional standards of procedural and substantive fair play. . . . This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to

assessing whether the agency was acting within its legal boundaries . . .; furthermore, when an agency is acting in a fact-finding capacity (quasi-judicial) the courts review the appealed conclusions by determining whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner." *Id.* at 223-24.

*Linchester* clearly indicates that not only is the scope of judicial review advocated by Stillman unconstitutional but that the mode of appeal provided by § 130 is sufficient to ensure that his right to a fair and impartial hearing is protected.

## VII

Stillman contends that the order revoking his license should be reversed because the Commission failed to comply with § 130 (g) (1), which provides:

"The Commission shall refer *any cases* coming to its attention to the appropriate local county society or committee of the Medical and Chirurgical Faculty of the State of Maryland, for investigation and report. The report shall be acted upon within 90 days unless there is a time extension granted by the Commission. The report shall contain recommendations the investigation reveals may be necessary for adequate disciplinary procedures. The recommendations shall then be considered by the Commission, which shall take whatever action it deems appropriate, as provided herein. . . ." (Emphasis supplied.)

Stillman argues that the word "cases" refers, in the plural, to the case of an individual patient who has been treated by the physician under investigation. Consequently, he urges that the Commission should have considered only the cases of patients treated by him that had been screened by the Peer Review Committee.

If the word "cases" in § 130 (g) (1) is construed narrowly to mean only patient cases, then the Commission would not have the authority, for example, to refer the "case" of a physician alleged to be an alcoholic to the Peer Review Committee for investigation. The subsection makes sense as an integral part of § 130 only if the word "cases" is construed to mean matters involving physicians who are to be investigated, and not merely the patient cases that may or may not form the basis for the investigation. Under this construction of the statute, which we adopt, the Commission was not precluded from considering patient cases other than those initially screened by the Peer Review Committee.[10]

## VIII

Finally, Stillman argues that the order revoking his license should be reversed because the Commission improperly restricted his cross-examination of Dr. Berman, the head of the Peer Review Committee which investigated his medical practice and recommended that his license be revoked.

On direct examination, Dr. Berman testified primarily about the contents of his committee's report on Stillman's medical practice. Upon Stillman's cross-examination of Dr. Berman, the following colloquy occurred.

"Q. Have you had any contact before May 18, 1978, or after, and coming right down to date, in the way of face-to-face discussion, telephone conversation, or other correspondence that might not be in the record with the Commission members about Dr. Stillman's case or any aspect of it?

A. Before May 18?

Q. Or after. The referral was on May 18.

A. Yes, after up until what time?

---

10. We note that Stillman has not argued on appeal, as he did below, that he was denied due process of law because the Commission performed both investigatory and adjudicatory functions.

Q. Today, this minute.

MS. GAUVEY: I have to object because it goes beyond the scope of direct. I don't think there were any questions raised about correspondence between the two parties.

THE CHAIRMAN: Sustained.

MR. LORD [Stillman's counsel]: Am I correct, Mr. Chairman, that I cannot ask any questions of Dr. Berman that would relate to these discussions outside the record with members of this Commission?

MR. CHAIRMAN: I think your question was too broad, Mr. Lord, I don't understand. Perhaps you can try again.

MR. LORD: All right.

Q. Bearing in mind, as you have said, that a lot of time has elapsed since this referral was made almost two years ago to the Med-Chi Committee, of which you were then Chairman, do you recall having any conversation initiated by you or someone else with any Commission member about Dr. Stillman's case since that date down to this moment.

A. Since that date down to this minute?

Q. Yes.

MS. GAUVEY: I'm going to object. Which date down to this minute?

MR. LORD: May 18, 1978.

MS. GAUVEY: I object because I don't think there was any discussion on direct as to Dr. Berman's relationship or contact with the Commission at that point. There was discussion about an earlier contact because of the referral but nothing about any later contact.

THE CHAIRMAN: Sustained."

Stillman contends that because of Dr. Berman's contacts with the Medical and Chirurgical Faculty, the Commission,

and the Department of Health and Mental Hygiene,[11] of which the Commission is a part, there existed a great risk that Dr. Berman had engaged in ex parte communications with the Commission, possibly concerning the criminal charges filed against Stillman, of which Stillman needed to be informed to rebut the information, if necessary. Moreover, Stillman asserts that the Commission violated its affirmative duty to place such communications on the record as required by Code (1957, 1978 Repl. Vol., 1981 Cum. Supp.) Art. 41, § 254A, and established principles of due process.[12]

Stillman further contends that the Commission should not have sustained the objection to his cross-examination of Dr. Berman because in the context of administrative hearings, "technical common law rules" do not apply. He also asserts that because Dr. Berman testified on direct examination concerning his committee's official communications with the Commission, the cross-examination was not beyond the scope of direct examination and, therefore, should not have been restricted. Finally, he maintains that because this segment of his cross-examination was of enormous importance to his case, the Commission's action deprived him of his right to a fair and impartial trial.

We cannot assume that § 254A was violated in this case because no ex parte communications between Dr. Berman

---

**11.** Dr. Berman is a Deputy Secretary of the Department of Mental Health and Hygiene. He testified that he had been an active member of the Faculty's Peer Review Committee, serving as Chairman for three years and participating to some degree in the investigation of seventy-five physicians.

**12.** Section 254A (a) provides that no person, not authorized to participate "in the decisional process of a contested case" shall communicate ex parte with the hearing officer or agency official involved in the

"decisional process of that case regarding any issue of fact or law in the case."

Section 254A (b) requires that the hearing officer or agency official who has knowledge of such ex parte communications

"shall place on the record all written communications received, a memorandum stating the substance of all oral communications received, all written responses to the communication, and a memorandum stating the substance of all oral responses made and shall send copies of such communications, memoranda, and responses to all parties."

and the Commission were placed on the record. The record before us does not suggest that any improper ex parte contacts were made, and we cannot conclude that the Commission violated § 254A in some way by limiting Stillman's cross-examination of Dr. Berman.

The stated ground for the objection to Stillman's cross-examination of Dr. Berman was that it exceeded the scope of direct examination. We have long held that cross-examination can relate only to the facts and incidents connected with matters stated in the direct examination of the witness, and if a party desires to examine a witness as to other matters, he must do so by making the witness his own. *Plank v. Summers,* 205 Md. 598, 608, 109 A.2d 914 (1954); *Williams v. Graff,* 194 Md. 516, 522, 71 A.2d 450 (1950); *Corens v. State,* 185 Md. 561, 566, 45 A.2d 340 (1946). Stillman suggests that because none of the cases propounding the above rule arose from administrative hearings and that because we have repeatedly held that administrative agencies are not bound by "technical common law rules of evidence," *Dickinson-Tidewater v. Supervisor,* 273 Md. 245, 253, 329 A.2d 18 (1974), the Commission erred in restricting his cross-examination on that ground. The short answer to his argument is that while administrative agencies are not bound to observe the "technical common law rules of evidence," they are not prevented from doing so as long as the evidentiary rules are not applied in an arbitrary or oppressive manner that deprives a party of his right to a fair hearing.

Control over the scope of cross-examination has traditionally been left to the discretion of the trial court unless there is "a showing of prejudicial abuse of discretion." *Fleming v. Prince George's County,* 277 Md. 655, 358 A.2d 892 (1976). The rule may properly be applied in administrative hearings. The record indicates that the Commission did not abuse its discretion by restricting Stillman's cross-examination and prevent Stillman from receiving a fair hearing. Although Stillman now asserts that the information he sought from Dr. Berman was of crucial

importance to his case, he did not call Dr. Berman as his own witness or advise the Commission of the purpose of his inquiry. Moreover, in view of the evidence establishing Stillman's professional incompetence, which Stillman does not contest, it is unlikely that any ex parte communication concerning the criminal charges against Stillman, of which he had been acquitted, had any bearing upon the outcome of the case.

> *As to No. 113: Judgment vacated and case remanded to the Baltimore City Court to be dismissed as moot; costs to be paid by appellee Irving M. Stillman.*
>
> *As to No. 18: Judgments affirmed; costs to be paid by appellant Irving M. Stillman.*