State of Maryland, et al. v. Jamie Falcon, et al., No. 28, September Term, 2016

**ARTICLE II, § 15 OF THE MARYLAND CONSTITUTION – SUSPENSION AND REMOVAL OF OFFICERS – ARTICLE 8 OF THE MARYLAND DECLARATION OF RIGHTS – SEPARATION OF POWERS DOCTRINE – CHAPTER 35 OF THE 2016 LAWS OF MARYLAND – MD. CODE ANN., EDUC. (1978, 2014 REPL. VOL., 2016 SUPP.) § 3-110(b) – SCHOOL BOARD NOMINATING COMMISSION OF ANNE ARUNDEL COUNTY –** Court of Appeals held that trial court erred in issuing preliminary injunction because Chapter 35 of 2016 Laws of Maryland ("Chapter 35") does not violate Article II, § 15 of Maryland Constitution or Article 8 of Declaration of Rights, but rather restructures or reconstitutes School Board Nominating Commission of Anne Arundel County and prospectively changes appointment process to grant appointment power to specified entities other than Governor; that terms of gubernatorial appointees were terminated as part of restructuring is permissible.

IN THE COURT OF APPEALS

OF MARYLAND

No. 28

September Term, 2016

_____

STATE OF MARYLAND, ET AL.

v.

JAMIE FALCON, ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: January 20, 2017

This case involves an alleged violation of the separation of powers doctrine. Specifically, the case concerns the allegation that the General Assembly usurped the power of the Governor of Maryland by amending Md. Code Ann., Educ. (1978, 2014 Repl. Vol., 2015 Supp.) ("ED (2015)") § 3-110(b), which governs the School Board Nominating Commission of Anne Arundel County ("the Nominating Commission") to, among other things, eliminate the ability of the Governor to appoint members to the Nominating Commission. The Nominating Commission's purpose "is to select nominees to be recommended to the Governor as qualified candidates for appointment to the Anne Arundel County Board of Education [("the School Board")]." Md. Code Ann., Educ. (1978, 2014 Repl. Vol., 2016 Supp.) ("ED (2016)") § 3-110(b)(1)(ii).

Before 2016, ED (2015) § 3-110(b)(2) provided that the Nominating Commission would consist of eleven members, five of whom were to be appointed by the Governor, and six of whom were to be appointed by various specified entities. In 2016, through Chapter 35 of the 2016 Laws of Maryland ("Chapter 35"), the General Assembly amended, among other statutory provisions, ED (2015) § 3-110(b)(2), to increase the number of members of the Nominating Commission from eleven to thirteen, to eliminate the Governor's ability to appoint five members, and to grant appointment authority to various specified entities for the resulting seven new appointments. See 2016 Md. Laws 600-02 (Vol. I, Ch. 35, H.B. 172). In other words, the amendment to ED (2015) § 3-110(b)(2) changed the Nominating Commission from a body, some of whose members were appointed by the Governor, and some of whose members were appointed by various specified entities, to a body that is completely comprised of members who are appointed

by various specified entities other than the Governor. Through Chapter 35, the General Assembly also ended the terms of the Governor's five appointees to the Nominating Commission early, causing the appointments to terminate as of June 1, 2016. See id. at 605.

Four of the five gubernatorial appointees filed suit in the Circuit Court for Anne Arundel County ("the circuit court"), contending that the General Assembly removed them from their positions as members of the Nominating Commission in violation of Article II, § 15 of the Maryland Constitution (Suspension and Removal of Officers) and Article 8 of the Maryland Declaration of Rights (Separation of Powers). The circuit court agreed and issued a preliminary injunction against implementation and enforcement of certain portions of Chapter 35, including those portions amending ED (2015) § 3-110(b)(2) to alter the membership and appointment process for members of the Nominating Commission and ending the terms of the current gubernatorial appointees on June 1, 2016. The State of Maryland ("the State") and Governor Lawrence J. Hogan, Jr. ("Governor Hogan"), Appellants, noted an appeal to the Court of Special Appeals, and, while the case was pending in that Court, filed in this Court a petition for a writ of *certiorari*.

This Court granted the petition. The petition raises the issues of whether the circuit court erred in enjoining the implementation of portions of Chapter 35 by concluding that Chapter 35 violated Article II, § 15 of the Maryland Constitution and Article 8 of the Maryland Declaration of Rights, and by treating members of the Nominating Commission as "civil officers" within the meaning of Article II, § 15. We hold that the circuit court erred in issuing the preliminary injunction because Chapter 35 does not violate Article II,

§ 15 of the Maryland Constitution or Article 8 of the Declaration of Rights, but rather restructures or reconstitutes the Nominating Commission and prospectively changes the appointment process to grant appointment power to specified entities other than the Governor; and that terminating the terms of the gubernatorial appointees as part of the restructuring is permissible. Given that Chapter 35 does not constitute a violation of Article II, § 15 of the Maryland Constitution or Article 8 of the Declaration of Rights, but instead restructures or reconstitutes the Nominating Commission, we need not reach the issue of whether members of the Nominating Commission are civil officers under Article II, § 15.

## BACKGROUND

### Statutory Background

The Governor appoints members of the School Board. See ED (2016) § 3-110(a)(2). Prior to 2007, when a vacancy on the School Board occurred, the Anne Arundel County School Board Nominating Convention, a private association, submitted a list of nominees; and, as a matter of custom, the Governor usually appointed a School Board member from the list of nominees. In 2007, however, that process changed with the establishment of the Nominating Commission, through an amendment to Md. Code Ann., Educ. (1978, 2006 Repl. Vol.) § 3-110. See 2007 Md. Laws 2700 (Vol. IV, Ch. 454, H.B. 1114).

From 2007 until 2016, ED (2015) § 3-110(b)(2) provided for the membership of, and appointments to, the Nominating Commission as follows:

(i) The Commission consists of 11 members who shall be appointed in accordance with this paragraph.

(ii) The Governor shall appoint five members, one from each legislative district that lies in whole or in part in Anne Arundel County.

(iii) The County Executive of Anne Arundel County shall appoint one member from the county at large.

(iv) The following organizations shall each appoint one member:

1. The Teachers Association of Anne Arundel County;

2. The Annapolis and Anne Arundel County Chamber of Commerce;

3. The Anne Arundel County Council of Parent Teacher Associations;

4. The Anne Arundel County Community College Board of Trustees; and

5. The Association of Educational Leaders (AEL).

ED (2015) § 3-110(b)(3) provided for the designation of the chair of the Nominating Commission, as well as length of terms, as follows:

(i) The Governor shall designate as chair of the Commission one of the five members appointed by the Governor under paragraph (2)(ii) of this subsection.

(ii) The term of the chair of the Commission is 4 years.

(iii) The Governor may reappoint the chair of the Commission for a second term.

(iv) The term of a member of the Commission is 4 years.

ED (2015) § 3-110(b)(4) provided for staffing of the Nominating Commission as follows:

"The Department of Legislative Services shall provide staff for the Commission."

ED (2015) § 3-110(b)(5) set forth the nomination process for the School Board, providing:

Beginning January 1, 2008, for each nomination to the [School B]oard, the Commission shall submit to the Governor a list of nominees that contains:

(i) At least two names for each vacancy; or

(ii) If there are fewer than two applicants for a vacancy, the number of names that is equal to the number of applicants for the vacancy.

ED (2015) § 3-110(a)(2) provided: "Except for the student member, the Governor shall appoint a member of the [School B]oard from a list of nominees submitted by the . . . Nominating Commission . . . as provided in subsection (b) of this section." A School Board member would then "serve for the remainder of the member's term, . . . subject to the approval or rejection of the registered voters of the county at the next general election." ED (2015) § 3-110(c)(1). In the general election, voters "vote[d] for the [School Board] member's retention or removal." ED (2015) § 3-110(c)(3)(i). ED (2015) § 3-110(c)(4) stated: "If the voters reject the retention of the member, or the vote is tied: (i) The position shall become vacant 10 days after certification of the election returns; and (ii) The member serves until a successor is appointed and qualifies." (Paragraph breaks omitted). In other words, in the event of a rejection of retention or a tied vote on the retention of a School Board member, the position automatically became vacant, and the nomination process would begin again.

In 2016, at the request of the Anne Arundel County Administration, House Bill 172 was introduced, proposing amendments to ED (2015) § 3-110(b). See 2016 Md. Leg. Sess. H.B. 172 at 1 (First Reader), available at http://mgaleg.maryland.gov/2016RS/bills/ hb/hb0172f.pdf [https://perma.cc/N2M5-ZWC9]. As originally introduced on January 21, 2016, House Bill 172 sought to alter the membership of the Nominating Commission by allowing certain chambers of commerce to appoint a member of the Nominating

Commission.  Specifically, House Bill 172 sought to:

> alter[] the membership of the [] Nominating Commission [] to provide that, beginning on a certain date and every certain number of years thereafter, one member shall be appointed by certain chambers of commerce on a rotating basis in a specified order; alter[] the term of the member appointed by a chamber of commerce; provid[e] for the termination of the term of a certain member of the Commission; and generally relat[e] to the membership of the . . . Nominating Commission[.]

Id.  At that time, House Bill 172 proposed eliminating ED (2015) § 3-110(b)(2)(iv)(2), which provided that the Annapolis and Anne Arundel County Chamber of Commerce appointed one member to the Nominating Commission, in favor of a new subparagraph (b)(2)(v) that was to provide as follows:

> Beginning July 1, 2016, and every 2 years thereafter, one member shall be appointed by a chamber of commerce based in Anne Arundel County on a rotating basis in the following order:
>
> 1. The West Anne Arundel County Chamber of Commerce;
>
> 2. The Northern Anne Arundel County Chamber of Commerce;
>
> 3. The Southern Anne Arundel Chamber of Commerce;
>
> 4. The Greater Crofton Chamber of Commerce;
>
> 5. The Greater Severna Park and Arnold Chamber of Commerce; and
>
> 6. The Annapolis and Anne Arundel County Chamber of Commerce.

2016 Md. Leg. Sess. H.B. 172 at 2-3 (First Reader).  The only other proposed amendment to ED (2015) § 3-110(b) was to decrease the term of a Nominating Commission member appointed by a Chamber of Commerce to two years, instead of four years.  See 2016 Md. Leg. Sess. H.B. 172 at 3 (First Reader).

Later, House Bill 172 underwent substantial amendment.  See 2016 Md. Leg. Sess.

H.B. 172 at 2-6 (Third Reader), available at http://mgaleg.maryland.gov/2016RS/bills/hb/hb0172t.pdf [https://perma.cc/H7YZ-SMS9]. As amended, among other things, House Bill 172 eliminated the process by which the Governor appointed members to the Nominating Commission, established a process by which members of the Nominating Commission were to be appointed by various groups, and was to take effect on June 1, 2016. See id. at 2-4, 6. Significant to this case, Section 2 of House Bill 172 provided as follows: "That the terms of the members of the . . . Nominating Commission . . . who were appointed by the Governor and are in office on the effective date of this Act shall terminate on June 1, 2016." Id. at 6.

The General Assembly passed the amended version of House Bill 172 and presented it to Governor Hogan for signature. Governor Hogan vetoed House Bill 172. In a letter to the Speaker of the House dated April 5, 2016, Governor Hogan explained the reasons for his veto, in pertinent part, as follows:

> On its face, House Bill 172 is unconstitutional because it only terminates the terms of the Governor's members of the . . . Nominating Commission. This action by the [General Assembly] violates the separation of powers doctrine as outlined by the Court of Appeals in *Schisler v. State*, 394 Md. 519[, 907 A.2d 175] (2006). While the General Assembly may change the appointment method of prospective members of a governmental body, it cannot abrogate the Governor's authority under Article II, Section 15 of the Maryland Constitution by terminating his current appointees prior to the expiration of their terms.
>
> . . . Section 2 of House Bill 172 . . . provides for premature termination, *i.e.*, removal, of the Governor's incumbent members, an improper reconstitution of the [Nominating] Commission that the Court of Appeals has found to be an unconstitutional "usurpation of executive power in violation of Article II, [Sections] 1, 9 and 15 of the Maryland Constitution" and a "violation of Article 8 of the Declaration of Rights of Maryland." *Schisler*, 394 Md. at 596[, 907 A.2d at 220]. Ultimately, the Governor's appointees must remain

- 7 -

in office until the end of their terms, unless terminated earlier by the Governor pursuant to Article II, Section 15 of the Maryland Constitution.

2016 Md. Leg. Sess. H.B. 172, Veto Letter (Apr. 5, 2016), available at http://mgaleg.

maryland.gov/2016RS/veto_letters/HB0172.pdf [https://perma.cc/F76M-8PC8] (fourth

alteration in original).

On April 7 and 8, 2016, the Maryland House and Senate, respectively, voted to

override Governor Hogan's veto. As a result, House Bill 172 became Chapter 35. See

2016 Md. Laws 599 (Vol. I, Ch. 35, H.B. 172). Chapter 35's stated purpose was as follows:

> FOR the purpose of altering the membership of the . . . Nominating Commission . . . ; requiring each member of the Commission to be a resident of Anne Arundel County; prohibiting, with a certain exception, a member of the Commission from being an employee of a county school board; altering the method of selecting and the term of the chair of the Commission; authorizing the reappointment of a member of the Commission; specifying the terms of certain members of the Commission; prohibiting a member of the Commission from serving more than a certain number of years; altering the entity required to provide staff for the Commission; requiring the affirmative vote of a certain number of members of the Commission for the approval of any action; prohibiting a member of the Commission from voting by proxy; requiring the Commission to require each applicant for a certain nomination to complete an application that includes certain information and a certain declaration; requiring the Commission to consult the Maryland Judiciary Case Search to verify certain statements; requiring a certain member of the [School] Board [] to resign effective a certain number of days after certification of certain election results; prohibiting a certain member of the [School] Board from continuing to serve under certain circumstances; providing for the termination of the terms of certain members of the Commission; and generally relating to the [School] Board [] and the . . . Nominating Commission[.]

Id. at 599-600 Section 2 of Chapter 35 provided that the terms of the Nominating

Commission members whom the Governor had appointed would terminate on June 1,

2016. See id. at 605.

On June 1, 2016, Chapter 35 became effective, amending ED (2015) § 3-110(b) and

(c). ED (2016) § 3-110(b)(2) and (3) provide for the membership of, and appointments to, the Nominating Commission as follows:

(2) The Commission consists of the following 13 members:

(i) Three members appointed by the County Executive of Anne Arundel County from the county at large:

1. One of whom shall be a parent of a child enrolled in the Anne Arundel County public school system; and

2. No more than one of whom may be a current employee of Anne Arundel County;

(ii) One member appointed by the Teachers Association of Anne Arundel County;

(iii) One member appointed by the Annapolis and Anne Arundel County Chamber of Commerce;

(iv) One member appointed by the Anne Arundel County Community College Board of Trustees;

(v) One member appointed by the Association of Educational Leaders (AEL);

(vi) Two members appointed by the Anne Arundel County Council of Parent Teacher Associations who may not:

1. Be affiliated with a teachers' union or association; or

2. Be a current employee of Anne Arundel County;

(vii) One member appointed by the Anne Arundel County Branch of the National Association for the Advancement of Colored People (NAACP);

(viii) One member appointed by CASA de Maryland;

(ix) One member appointed by the Anne Arundel Special Education Citizens' Advisory Committee who is a parent of a child with special needs in the Anne Arundel County public school system; and

(x) Beginning June 1, 2016, and every 2 years thereafter, one member appointed by a chamber of commerce based in Anne Arundel County on a rotating basis in the following order:

1. The West Anne Arundel County Chamber of Commerce;

2. The Northern Anne Arundel County Chamber of Commerce;

3. The Southern Anne Arundel Chamber of Commerce;

4. The Greater Crofton Chamber of Commerce; and

5. The Greater Severna Park and Arnold Chamber of Commerce.

(3)     (i) Each member of the Commission must be a resident of Anne Arundel County.

(ii) Except for the members appointed under paragraph (2)(ii) and (v) of this subsection, a member of the Commission may not be a current employee of a county school board.

To summarize, with Chapter 35, the General Assembly increased the number of members from eleven to thirteen; eliminated the Governor's ability to appoint five members; enabled the County Executive of Anne Arundel County to appoint three members instead of one; enabled the Anne Arundel County Council of Parent Teacher Associations to appoint two members instead of one; enabled one appointment by each of the following: the Anne Arundel County Branch of the National Association for the Advancement of Colored People, CASA de Maryland, the Anne Arundel Special Education Citizens' Advisory Committee, and one among a rotating list of the chambers of commerce of Anne Arundel County; and required that all members of the Nominating Commission be residents of Anne Arundel County.   In short, the General Assembly created two new memberships,

eliminated the Governor's ability to appoint five members, allotted the resulting seven new appointments among various entities, and required that all members of the Nominating Commission be residents of Anne Arundel County.

ED (2016) § 3-110(b)(4) provides for the selection and term of the chair of the Nominating Commission as follows: "(i) The Commission shall select a chair from among its members. (ii) The term of the chair of the Commission is 2 years." (Paragraph break omitted). Thus, the General Assembly removed the Governor's ability to designate the chair of the Nominating Commission from among the gubernatorial appointees, and decreased the chair's term from four years to two years.

ED (2016) § 3-110(b)(5) provides for term lengths and term limits as follows:

(i) Except as provided in subparagraph (ii) of this paragraph, the term of a member of the Commission is 4 years.

(ii) The term of a member appointed by a chamber of commerce under paragraph (2)(x) of this subsection is 2 years.

(iii) A member may be reappointed but may not serve more than 8 years.

Thus, the General Assembly created an eight-year term limit on membership.

ED (2016) § 3-110(b)(6) provides for staffing as follows: "The [School] Board [] shall provide staff for the Commission." Thus, the General Assembly replaced the Department of Legislative Services with the School Board as the entity responsible for providing staff to the Nominating Commission.

And, ED (2016) § 3-110(b)(7) and (8) provide for a supermajority vote to take action, prohibit proxy voting, and set forth School Board nomination application requirements as follows:

(7)   (i) The affirmative vote of at least eight members of the Commission is required for the approval of any action.

(ii) A member of the Commission may not vote by proxy.

(8)   (i) The Commission shall require each applicant for nomination to complete an application that includes:

1. The full name and address of the individual;

2. Any former name used by the individual;

3. A statement as to whether the individual has any conviction for a crime that:

A. Relates to the responsibilities of a member of the [School B]oard; and

B. Has not been expunged or otherwise shielded;

4. A statement as to whether the individual has been adjudged bankrupt or insolvent; and

5. A declaration that the statements made in the application are true, correct, and complete to the best of the individual's knowledge and belief.

(ii) The Commission shall consult the Maryland Judiciary Case Search to verify the statements made by the applicant under subparagraph (i) of this paragraph.

These provisions are new—*i.e.*, they have no counterpart in ED (2015) § 3-110.

Like ED (2015) § 3-110(b)(5), ED (2016) § 3-110(b)(9) provides for the same nomination process for the School Board:

Beginning January 1, 2008, for each nomination to the [School B]oard, the Commission shall submit to the Governor a list of nominees that contains:

(i) At least two names for each vacancy; or

(ii) If there are fewer than two applicants for a vacancy, the number

- 12 -

of names that is equal to the number of applicants for the vacancy. And, like ED (2015) § 3-110(a)(2), ED § 3-110(a)(2) provides that, "[e]xcept for the student member, the Governor shall appoint a member of the [School B]oard from a list of nominees submitted by the . . . Nominating Commission . . . as provided in subsection (b) of this section."

As to the terms of service of School Board members, like ED (2015) § 3-110(c)(1), ED (2016) § 3-110(c)(1) provides that, after appointment, a School Board member "serves for the remainder of the member's term, . . . subject to the approval or rejection of the registered voters of the county at the next general election." And, like ED (2015) § 3-110(c)(3)(i), ED (2016) § 3-110(c)(3)(i) provides that, at the general election, voters shall "vote for the [School Board] member's retention or removal." ED (2016) § 3-110(c)(4), however, now provides:

If the voters reject the retention of the member, or the vote is tied:

(i) The position shall become vacant 10 days after certification of the election returns;

(ii) The member shall resign from the [School B]oard effective 10 days after certification of the election returns; and

(iii) The member may not continue to serve on the [School B]oard.

As a result, ED (2016) § 3-110(c)(4)(ii) requires a School Board member who loses a retention election or who receives a tied vote in a retention election to resign, as opposed to serving until a successor is appointed, as required under ED (2015) § 3-110(c)(4)(ii). As such, currently, in the event of a rejection of retention or a tied vote on the retention of a School Board member, the position automatically becomes vacant, the School Board

- 13 -

member must resign, and the nomination process begins.

**This Case**

Governor Hogan appointed Jamie Falcon ("Falcon"), Appellee, to the Nominating Commission, effective July 1, 2015, for a term of four years, to serve until June 30, 2019. Governor Hogan also designated Falcon as the Chair of the Nominating Commission. Governor Hogan appointed Kam R. Gast ("Gast"), Susannah Warner Kipke ("Kipke"), and Joan Maynard ("Maynard"), Appellees, to the Nominating Commission, effective July 1, 2015, for terms of four years each, to serve until June 30, 2019.

On May 6, 2016—after the General Assembly voted to override Governor Hogan's veto of House Bill 172 on April 7 and 8, 2016, but before Chapter 35 become effective on June 1, 2016—Falcon, Gast, Kipke, and Maynard, four of the five gubernatorial appointees to the Nominating Commission (together, "the Appointees"), filed in the circuit court a "Verified Complaint for Declaratory Judgment and for a Temporary Restraining Order and Preliminary and Permanent Injunctive Relief" against the State. In the complaint, the Appointees contended that, through Chapter 35, the General Assembly removed them from their positions as members of the Nominating Commission in violation of Article II, § 15 of the Maryland Constitution (Suspension and Removal of Officers) and Article 8 of the Maryland Declaration of Rights (Separation of Powers). The Appointees argued that they are "civil officers" under Article II, § 15 and that the General Assembly had violated the separation of powers doctrine by usurping the Governor's exclusive authority to remove civil officers whom the Governor had appointed, as established by Article II, § 15 of the Maryland Constitution, which provides, in relevant part, that "[t]he Governor . . . may

- 14 -

remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years." The Appointees noted that Chapter 35 removed only the gubernatorial appointees, not any other members of the Nominating Commission, and asserted that Chapter 35 did not reconstitute the Nominating Commission.

As such, in the complaint, the Appointees sought a declaratory judgment that Chapter 35 violated Article II, § 15 of the Maryland Constitution and Article 8 of the Maryland Declaration of Rights. The Appointees also sought injunctive relief in the form of: a temporary restraining order; a preliminary injunction preventing Chapter 35 from taking effect and preventing the State from implementing Chapter 35 during the pendency of the litigation; and a permanent injunction preventing Chapter 35 from taking effect and preventing the State from implementing Chapter 35 permanently.

On May 10, 2016, the circuit court conducted a hearing on the request for a temporary restraining order, and on May 11, 2016, the circuit court entered an order denying the request for a temporary restraining order. On May 17, 2016, the State filed an opposition to the request for a preliminary injunction, contending that the Appointees were not entitled to declaratory or injunctive relief because the State had sovereign immunity, which it had not waived. The State further asserted that a plaintiff could bring suit for declaratory and injunctive relief only against the "specific government official who is responsible for action under the statute, not against the State itself." (Citations and internal quotation marks omitted). The following day, on May 18, 2016, the Appointees filed an amended complaint, naming Governor Hogan in his official capacity as an additional defendant, and alleging that Governor Hogan "is responsible for taking care that the Laws

are faithfully executed."[1]  (Citation, brackets, and internal quotation marks omitted).

On May 23, 2016, the circuit court conducted a hearing on the request for a preliminary injunction.  After hearing argument from the parties, the circuit court granted the request for a preliminary injunction and ruled orally from the bench, in pertinent part, as follows:

> The Court just believes this is so similar to Schis[]ler, [394 Md. 519, 907 A.2d 175,] the timing, the other facts, it appears the [G]eneral [A]ssembly is merely crafting a way to oust current members appointed by the Governor.  Article 2 § 15, II, just it appears to the Court that it just completely violates the separation of powers.  And though the [State] argue[s] that there were substantive changes to the regulation aimed at reconstitution, the Court is just not satisfied that this is really the end goal of the [G]eneral [A]ssembly.
>
> The new process . . . it really appears to the Court that this is the [General Assembly] finding a way to basically nominate whoever they want to the positions by doing through these groups. . . . I just can't get around the fact that [] it is only the five gubernatorial appointees.
>
> So, the Court does believe that they are [civil] officers. . . . So the role is not purely advisory, they play a key part in the appointment process.
>
> . . .
>
> The injunction is preliminary, I will grant it.  I will order that the [Appointees] shall not be terminated from their position.  I will order that the new board not take place without those five members of the Governor's -- who has previously been appointed to their term.  I will require [the Appointees' counsel] to prepare an order and submit it to the Court within two days.

On May 25, 2016, the Appointees submitted to the circuit court a proposed order

---

[1]Although Governor Hogan is an appellant in this case, we shall refer to the State and Governor Hogan together as "the State" for purposes of this opinion, unless otherwise indicated.

- 16 -

that enjoined Chapter 35 in its entirety. On the same day, the State objected to the Appointees' proposed order and submitted an alternative proposed order. The State contended that, even under the circuit court's view of the law, many provisions of Chapter 35 did not raise separation of powers concerns, were severable, and should be permitted to go into effect. On May 27, 2016, the circuit court issued a brief memorandum, stating that it believed that the proposed order submitted by the State "most accurately reflect[ed] the holding and intention of the Court" and that it would sign that order. As such, on May 27, 2016, the circuit court adopted and issued the State's proposed order, which provided as follows:

> The [Appointees] have established they meet the requirements for preliminary injunctive relief: (1) the [Appointees] have established a likelihood of success on the merits, (2) the balance of convenience weighs in favor of the [Appointees], (3) the [Appointees] will suffer irreparable harm in the absence of a preliminary injunction, and (4) a preliminary injunction is in the public interest.

> It is likely that the [Appointees] will establish that the following provisions of 2016 Md. Laws ch. 35 (House Bill 172) violate Article 8 of the Maryland Declaration of Rights and Article II, § 15 of the Maryland Constitution: (1) 2016 Md. Laws ch. 35 (House Bill 172) § 2, providing that "the terms of the members of the . . . Nominating Commission . . . who were appointed by the Governor and are in office on the effective date of this Act shall terminate on June 1, 2016" and (2) those portions of 2016 Md. Laws ch. 35 (House Bill 172) § 1 that amend [ED (2015)] § 3-110(b)(2) to alter the membership and appointment process for members of the . . . Nominating Commission[.]

> Accordingly, it is the 27th day of May 2016, by the Circuit Court for Anne Arundel County, ORDERED that the Motion for Preliminary Injunction is GRANTED. It is further ORDERED that, during the pendency of this litigation, implementation and enforcement of the following provisions of 2016 Md. Laws ch. 35 (House Bill 172) are enjoined, subject to further order of the Court:

- 17 -

(1) 2016 Md. Laws ch. 35 (House Bill 172) § 2, providing that "the terms of the members of the . . . Nominating Commission . . . who were appointed by the Governor and are in office on the effective date of this Act shall terminate on June 1, 2016" and

(2) those portions of 2016 Md. Laws ch. 35 (House Bill 172) § 1 that amend [ED (2015)] § 3-110(b)(2) to alter the membership and appointment process for members of the . . . Nominating Commission[.]

On May 31, 2016, the State noted an appeal to the Court of Special Appeals. On June 3, 2016, while the case was pending in the Court of Special Appeals, the State filed in this Court a petition for a writ of *certiorari*. On July 11, 2016, this Court granted the petition. See State v. Falcon, 448 Md. 724, 141 A.3d 135 (2016).

## STANDARD OF REVIEW

In reviewing a trial court's decision to issue a preliminary injunction, this Court considers the following factors:

(1) the likelihood that the plaintiff will succeed on the merits; (2) the balance of convenience determined by whether greater injury would be done to the defendant by granting the injunction than would result by its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest.

Schade v. Md. State Bd. of Elections, 401 Md. 1, 36, 930 A.2d 304, 325 (2007) (citations and internal quotation marks omitted). This Court reviews "the exercise of the trial court's discretion to grant or deny a request for injunctive relief under an abuse of discretion standard; however, we give no such deference when we find an obvious error in the application of the principles of equity." El Bey v. Moorish Sci. Temple of Am., Inc., 362 Md. 339, 354-55, 765 A.2d 132, 140 (2001) (citations and internal quotation marks

omitted); see also City of Bowie v. MIE Props., Inc., 398 Md. 657, 677, 922 A.2d 509, 521 (2007) ("We generally review the issuance of an injunction by a trial court for an abuse of discretion." (Citation omitted)).

"[E]ven with respect to a discretionary matter, [however,] a trial court must exercise its discretion in accordance with correct legal standards." Ehrlich v. Perez, 394 Md. 691, 708, 908 A.2d 1220, 1230 (2006) (citation and internal quotation marks omitted). Where a trial court's determination as to one of the factors for issuing a preliminary injunction involves a purely legal question, i.e., a question of law, we review the trial court's decision as to that factor without deference. See id. at 708, 908 A.2d at 1230 ("We review de novo a trial [court]'s decision involving a purely legal question. . . . In the present case, the [trial c]ourt's determination of the likelihood of success on the merits is a question of law. Consequently, we apply the de novo standard to that factor[.]" (Citations omitted)).

## DISCUSSION

### The Parties' Contentions

The State contends that, under Schisler, 394 Md. 519, 907 A.2d 175, the removal of gubernatorial appointees, by itself, does not violate Article II, § 15 of the Maryland Constitution. The State argues that Chapter 35 is consistent with the separation of powers doctrine and Article II, § 15 of the Maryland Constitution because the power of appointment is not an intrinsically executive function, i.e., a power that is exclusive to the Governor; instead, under Article II, § 10 of the Maryland Constitution, the General Assembly may prescribe a different mode of appointment. The State asserts that the General Assembly may restructure or reconstitute a statutorily-created entity and

- 19 -

prospectively change the appointment process to grant the appointment power for that entity to someone other than the Governor, even if doing so would terminate the existing gubernatorial appointees.

The State contends that Chapter 35 changes the number and composition of the Nominating Commission, and creates a new appointment process that applies prospectively to all future appointees. According to the State, through Chapter 35, the General Assembly did not give itself the power to choose replacements for the Appointees or prevent the Appointees from being reappointed, but rather reassigned the appointment power from the Governor to other entities. The State argues that the Appointees draw an "artificial distinction" by pointing out that the General Assembly terminated only the Appointees' membership on the Nominating Commission, and left intact the other six existing appointments—*i.e.*, the appointments by entities other than the Governor— because terminating the other existing appointments would not have given the General Assembly any more authority to terminate the Appointees' membership on the Nominating Commission than it already had. The State further contends that, even assuming that, through Chapter 35, the General Assembly were "removing" the Appointees, such a removal does not violate Article II, § 15 because members of the Nominating Commission are not "civil officers."

The Appointees respond that Chapter 35 is unconstitutional and violates the separation of powers doctrine and Article II, § 15 of the Maryland Constitution because the General Assembly has impermissibly usurped the Governor's constitutional removal power by terminating only their appointments. According to the Appointees, the removal

- 20 -

of civil officers who are appointed by the Governor for a term of years is a constitutional power that is reserved exclusively to the Governor, and cannot be exercised by the General Assembly. The Appointees contend that, under Schisler, 394 Md. 519, 907 A.2d 175, the General Assembly may abolish or reconstitute a commission, but may not terminate only the gubernatorial appointees on a commission. The Appointees argue that, in this case, the General Assembly impermissibly terminated only their appointments, left intact the other appointments—*i.e.*, appointments by entities other than the Governor—and that such actions were not taken to reconstitute the Nominating Commission. The Appointees assert that the General Assembly had the authority to set up the appointment process however it chose, but that, once the General Assembly vested the Governor with the power to appoint members of the Nominating Commission, the gubernatorial appointees could be removed only by the Governor. The Appointees contend that they are "civil officers" under Article II, § 15, subject only to the Governor's constitutional removal power because the term "civil officer" is interpreted broadly in Schisler, 394 Md. 519, 907 A.2d 175, to include any officer other than a military officer.

**Law**

***The School Board and the Nominating Commission***

Like ED (2015) § 3-110(a)(2), ED (2016) § 3-110(a)(2) provides that, "[e]xcept for the student member, the Governor shall appoint a member of the [School B]oard from the list of nominees submitted by the . . . Nominating Commission[.]" Similarly, both ED (2015) § 3-110(g)(1) and ED (2016) § 3-110(g)(1) provide that the president of the School Board "is entitled to receive $8,000 annually as compensation and, except for the student

member, the other [School B]oard members are entitled to receive $6,000 each annually as compensation."[2] By contrast, both before and after Chapter 35, members of the Nominating Commission have not been entitled to compensation. See ED (2015) § 3-110(b); ED (2016) § 3-110(b). And, as discussed above, prior to Chapter 35, the Nominating Commission consisted of eleven members, five of whom were appointed by the Governor. See ED (2015) § 3-110(b)(2).

### *The Separation of Powers Doctrine*

The separation of powers doctrine is embodied in Article 8 of the Maryland Declaration of Rights, which provides: "[T]he Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." "Article 8 of the Maryland Declaration of Rights explicitly prohibits one branch of government from assuming or usurping the power of any other branch." State v. Callahan, 441 Md. 220, 235, 107 A.3d 1143, 1151 (2015) (brackets, citation, and internal quotation marks omitted). The separation of powers doctrine does not, however, require "absolute separation" or "strict lines of demarcation" among the three branches of government. Merchant v. State, 448 Md. 75, 96-97, 136 A.3d 843, 856-57 (2016) (citations omitted). Indeed, the separation of powers doctrine "may constitutionally encompass a sensible degree of elasticity[,]" provided that that constitutional elasticity is not "stretched

---

[2]Pursuant to ED (2016) § 3-110(g)(2), "[a] student member who completes a full term on the [School B]oard shall be granted a scholarship of $6,000 to be applied toward the student's higher education costs."

to a point where, in effect, there no longer exists a separation of governmental power[.]" Id. at 97, 136 A.3d at 857 (citations omitted).

### *Article II, § 15 and Schisler v. State*

Article II, § 15 of the Maryland Constitution provides:

The Governor may suspend or arrest any military officer of the State for disobedience of orders, or other military offense; and may remove him in pursuance of the sentence of a Court-Martial; and may remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years.

This Court most recently addressed Article II, § 15 ten years ago, in Schisler, 394 Md. 519, 907 A.2d 175, a case that is key to the issues before the Court in this case. Because Schisler is a significant case, we shall discuss it in some detail. We first observe that Schisler is a plurality opinion, and the parties in this case disagree on the meaning and interpretation of the opinion. As to plurality opinions, this Court has applied the following test for determining the precedential value of a case that lacks a majority opinion by the Supreme Court: "When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." State v. Norton, 443 Md. 517, 539-40, 117 A.3d 1055, 1068 (2015) (citation and internal quotation marks omitted); see also Derr v. State, 434 Md. 88, 114, 73 A.3d 254, 269 (2013) (same). This approach is known as the "Marks approach," after Marks v. United States, 430 U.S. 188, 193 (1977), the case in which the Supreme Court set forth the standard to be applied to review of fractured opinions of the Supreme Court.

- 23 -

This Court has applied a somewhat similar approach in determining the precedential significance of a case without a majority opinion by this Court. See, e.g., Cure v. State, 421 Md. 300, 318, 321, 26 A.3d 899, 910, 911 (2011) (In analyzing what this Court termed a "fractured" opinion, we explained why we were adopting the reasoning of the dissent, stating: "For purposes of *stare decisis*, we note that this is a proposition that garnered the support of four Judges[.]"); see also State v. Giddens, 335 Md. 205, 213 & n.6, 642 A.2d 870, 874 & n.6 (1994) (This Court stated that the issue of whether a prior conviction bears on witness credibility is a matter of law because, in an earlier case with no majority, "two concurring judges and two dissenting judges[—*i.e.*, four Judges—]each thought that the question was a matter of law.").

Having discussed how precedential value is determined with a plurality opinion, we turn to Schisler. In Schisler, 394 Md. at 523, 907 A.2d at 177, a plurality of this Court concluded that two sections of a Senate bill, as enacted by the General Assembly, which terminated the appointments of certain members of the Public Service Commission of Maryland, violated the Maryland Constitution. Specifically, the plurality determined that the two sections of the Senate bill violated the separation of powers doctrine because they usurped the Governor's power to supervise the Executive Branch under Article II, § 1 of the Maryland Constitution, usurped the Governor's power to execute the laws under Article II, § 9 of the Maryland Constitution, and usurped the Governor's power to terminate officers of the Executive Branch under Article II, § 15 of the Maryland Constitution. See Schisler, 394 Md. at 523, 907 A.2d at 177. In Schisler, id. at 524, 907 A.2d at 177-78, in response to a utility rate crisis, the General Assembly passed a Senate bill as emergency

legislation to make various changes to the Public Utilities Article; the Governor vetoed the bill; the General Assembly voted to override the veto; and the bill was to become immediately effective. The bill "ostensibly" reconstituted the Public Service Commission, provided current rate relief, and established processes by which to study rate increases. Id. at 524-25, 907 A.2d at 178.

The Public Service Commission "is a statutorily created independent unit in the Executive Branch of State government." Id. at 525, 907 A.2d at 178 (citation omitted). The bill that the General Assembly passed did not affect the statute that created the Public Service Commission, but rather included two sections that affected the terms of office of the members of the Public Service Commission and the future appointment of interim members. See id. at 525, 907 A.2d at 178. Prior to the enactment of the bill, the Public Service Commission had five members, who were appointed by the Governor with the advice and consent of the Senate to five-year, staggered terms, and the chair of the Public Service Commission was designated from among the members by the Governor with the advice and consent of the Senate to serve a five-year term. See id. at 526-27, 907 A.2d at 179-80. Moreover, prior to the enactment of the bill, the Governor appointed the members of the Public Service Commission and designated the chair, "subject to Senate confirmation, without being restricted to a list from the President of the Senate of Maryland and the Speaker of the House of Delegates." Id. at 527-28, 907 A.2d at 180.

The bill amended the relevant statute in the Public Utilities Article to provide that all existing members of the Public Service Commission would be terminated by a certain date, and that the President of the Senate and the Speaker of the House would submit lists

- 25 -

of names, from which the Governor would choose five new members of the Public Service Commission. See id. at 525 n.9, 907 A.2d at 178 n.9. The bill also provided that, if the Governor failed to choose five new members of the Public Service Commission, then the President of the Senate and the Speaker of the House would appoint enough new members for a fully constituted Public Service Commission. See id. at 525 n.9, 907 A.2d at 178 n.9.[3] This appointment process was intended to be temporary. The bill further provided that, after the new temporary method of appointment of members to the Public Service Commission and after the terms of the interim members expired, future members of the Public Service Commission would be appointed by the Governor with the advice and consent of the Senate. See id. at 545, 907 A.2d at 190. The chair of the Public Service Commission—who was appointed by the Governor and confirmed by the Senate—sued the State individually and purportedly on behalf of the other similarly situated members of the Public Service Commission, contending that the bill violated the Maryland Constitution, the Maryland Declaration of Rights, the United States Constitution, and the Code of Maryland. See id. at 522-23, 528, 907 A.2d at 177, 180. The trial court denied the Public Service Commission chair's motion for a temporary restraining order and

---

[3]Another section of the bill provided that, if the section of the bill terminating the offices of the chair and members of the Public Service Commission were declared invalid, then the term of the chair and members would be "eliminated" and the members would serve at the pleasure of the Attorney General, who would be authorized to terminate their service and appoint their successors. Schisler, 394 Md. at 525 n.9, 907 A.2d at 178 n.9. Another section of the bill provided that, if the sections of the bill concerning the President of the Senate and Speaker of the House were declared invalid, then the Attorney General would appoint the members and chair of the Public Service Commission. See id. at 525 n.9, 907 A.2d at 178 n.9.

preliminary injunction.  See id. at 522, 907 A.2d at 177.  The Public Service Commission chair noted an appeal to this Court.  See id. at 523, 907 A.2d at 177.

This Court reversed the trial court's judgment.  See id. at 603, 907 A.2d at 225. Writing for a three-judge plurality, Judge Dale R. Cathell concluded that the bill violated the separation of powers doctrine by, among other things, usurping the Governor's power to terminate officers of the Executive Branch under Article II, § 15 of the Maryland Constitution (Suspension and Removal of Officers).  See id. at 523, 907 A.2d at 177.  As an initial matter, the plurality reviewed the legislative history of the bill and concluded that the purpose of the section of the bill at issue "was to remove the current members of the Public Service Commission[,]" and that it simply could not be argued that the General Assembly was, in actuality, "enacting a general restructuring of the statute or was, specifically, merely restructuring the [Public Service] Commission."  Id. at 547, 907 A.2d at 191.  Significantly, the plurality determined that the Public Service Commission members were "officers in the Constitutional sense[,]" and thus "civil officers" within the meaning of Article II, § 15; according to the plurality, there was "no longer any reason or need to give the term 'civil officer' an artificially narrow definition[,]" and instead "the term 'civil officer' should be given its normal meaning as any officer other than a military officer."  Id. at 549, 907 A.2d at 192-93.[4]

---

[4]Of note, pursuant to Md. Code Ann., Pub. Util. (1998, 2010 Repl. Vol.) ("PU") § 2-102(a) and (c), a commissioner on the Public Service Commission is "appointed by the Governor with the advice and consent of the Senate[,]" and must "devote full time to the duties of the office."  And, pursuant to PU § 2-107(a), each commissioner, including the chairperson, is "entitled to compensation as provided in the State budget."  PU § 2-107(b)

The plurality concluded that the General Assembly's termination of the existing members of the Public Service Commission violated the separation of powers doctrine under three different separation of powers tests: (1) the Public Service Commission is an Executive agency, and the removal of the members of the Public Service Commission is a power that is reserved to the Executive; (2) the General Assembly improperly attempted to control the actions of an Executive agency; and (3) because Article II, § 15 vests the Governor with the authority to remove all civil officers, the General Assembly's "attempt to remove the [Public Service] Commissioners through the use of [the b]ill [] constitute[d] a usurpation by one department of the powers of another department[,]" which "clearly interfere[d] with the functions specifically granted to the Governor by the Maryland Constitution." Schisler, 394 Md. at 565-66, 907 A.2d at 202 (citation, brackets, and internal quotation marks omitted). The plurality explained that the bill violated Article II, § 15 of the Maryland Constitution because it constituted a "usurpation of the removal power granted to the Governor[.]" Id. at 602, 907 A.2d at 224. The plurality observed that Article II, § 15 of the Maryland Constitution was "absolutely silent on any [] mode of termination" other than removal by the Governor. Id. at 597, 907 A.2d at 221. Indeed, in Schisler, id. at 596, 907 A.2d at 220, the plurality stated:

> We hold that the power to remove officers appointed by a Governor, during the term of the officers' appointment, for misconduct or incompetency, is solely the Governor's and the attempt by the [General Assembly] to terminate those officers, previously appointed by the Governor and approved by the Senate, prior to the expiration of their terms of office,

provides that "[t]he salary of the Chair[person] of the [Public Service] Commission shall be at least $40,000 a year" and that "[t]he salary of each commissioner shall be at least $35,000 a year."

- 28 -

was an usurpation of executive power in violation of Article II, §§ 1, 9, and 15 of the Maryland Constitution and in violation of Article 8 of the Declaration of Rights of Maryland.

The plurality explained that its conclusion was unchanged by Article II, § 10 of the Maryland Constitution (Appointment of Officers), which states: "[The Governor] shall nominate, and, by and with the advice and consent of the Senate, appoint all civil and military officers of the State, whose appointment, or election, is not otherwise herein provided for, unless a different mode of appointment be prescribed by the Law creating the office." See Schisler, 394 Md. at 595, 907 A.2d at 220. The plurality pointed out that, "[a]t the time of the creation of the Public Service Commission, and at the time the current members were appointed, there was no other mode of appointment that was created by the Public Service Commission Act." Id. at 581, 907 A.2d at 211 (emphasis omitted). The plurality also noted that, unlike Article II, § 10 of the Maryland Constitution, Article II, § 15 of the Maryland Constitution contained no exception for "a different mode of appointment [] prescribed by the Law"; additionally, Article II, § 15 mentioned only the Governor, not the General Assembly or statutory law. See Schisler, 394 Md. at 595, 907 A.2d at 220. Indeed, the plurality stated:

> In the circumstances of Section 15—the creation of the power in the Governor with no mention of the Legislature[—]acts under the maxim, "*expressio unius est exclusio alterius*," to exclude the Legislature from sharing the removal power of the Governor at least as to those officers appointed by the Governor for a term of years.

Id. at 595, 907 A.2d at 220 (italics in original) (footnote omitted). Thus, the plurality concluded that the power to remove civil officers was exclusive to the Governor. See id. at 595, 907 A.2d at 220.

- 29 -

The plurality explained, however, that the General Assembly is authorized, under proper circumstances, to "effectively terminate the tenure of civil officers not having a fixed Constitutionally-set term[,]" stating: "If the General Assembly chooses to abolish or reconstitute the Public Service Commission or any other statutory board or commission, it is competent to do so, even if the effect of that abolition or reconstitution would be the shortening or ending of existing terms of incumbent members." Id. at 598, 907 A.2d at 222. The plurality determined that the General Assembly did not abolish or reconstitute the Public Service Commission because it "left the [Public Service] Commission essentially intact and [] instead ended the terms of the five incumbents and effectively precluded the incumbent Governor from reappointing them by requiring that his appointees be from a list submitted by the [General Assembly]." Id. at 598-99, 907 A.2d at 222. Ultimately, the plurality concluded that the sections of the bill that were unconstitutional were severable, and that the remainder of the bill that could "operate within the parameters of th[e] opinion remain[ed] in effect." Id. at 603, 907 A.2d at 225.

In a concurring opinion, Judge Alan M. Wilner joined the judgment on the ground that sections of the bill violated the separation of powers. See id. at 606, 907 A.2d at 226 (Wilner, J., concurring). Judge Wilner explained that he differed from the plurality "only in that [he] would rest the decision solely on the basis of Article 8 of the Declaration of Rights [(Separation of Powers)] and Article II, §§ 1 and 9 of the Constitution" because he did "not believe that the first part of [a section] of [the b]ill []—ending prematurely the terms of the incumbent members of the Public Service Commission—of itself violates Article II, § 15 of the Constitution." Schisler, 394 Md. at 605, 907 A.2d at 226 (Wilner,

J., concurring). Judge Wilner stated that, if the General Assembly had simply ended the Public Service Commission members' terms and directed the Governor to appoint replacement members, there "may well" have been no violation of the separation of powers doctrine. Id. at 605, 907 A.2d at 226 (Wilner, J., concurring).

Judge Wilner also explained that he agreed with the plurality that the General Assembly, "if it chose, could abolish or reconstitute the Public Service Commission (or any other statutory board or commission), even if the effect of doing so would be the premature ending of existing terms of incumbent members, and, as part of any reconstitution of the [Public Service] Commission, it could alter the method of appointment." Id. at 605, 907 A.2d at 226 (Wilner, J., concurring). According to Judge Wilner, the problem in Schisler however, was that the General Assembly not only ended the Public Service Commission members' terms without abolishing or reconstituting the Public Service Commission, but also "left the [Public Service] Commission essentially intact [and] simply ended the terms of the incumbent Commissioners and sharply curtailed the power of the Governor to appoint their successors." Id. at 605-06, 907 A.2d at 226 (Wilner, J., concurring). As to whether the Public Service Commission members are civil officers, Judge Wilner commented that he thought that the dissent was "probably wrong . . . in assuming or suggesting that members of the Public Service Commission are not civil officers, although, because [he did] not believe that Article II, § 15 [was] implicated in any telling matter, [he did] not regard that error as significant[.]" Id. at 604-05, 907 A.2d at 226 (Wilner, J., concurring).

In a concurring and dissenting opinion that Judge Irma S. Raker joined, Judge Glenn

T. Harrell, Jr. opined that the General Assembly violated the separation of powers doctrine by setting up an appointment process that applied only to the immediate successors of the terminated Public Service Commission members, and thus establishing "what essentially is a mock gubernatorial appointment process." Id. at 606-07, 907 A.2d at 227 (Harrell, J., concurring and dissenting). Unlike the plurality and Judge Wilner, Judge Harrell took no issue with the General Assembly ending the terms of the Public Service Commission members early, concluding that the General Assembly "possesses the power to modify the terms of the service of the incumbent members . . . so as to terminate their service as of" a certain date. Id. at 606, 907 A.2d at 227 (Harrell, J., concurring and dissenting).[5] Judge Harrell concluded that the Public Service Commission members are civil officers within the meaning of Article II, § 15, and echoed the reasoning of the plurality, stating: "There is no longer any reason or need to give the term 'civil officer' [] an artificially narrow definition. The term 'civil officer' should be given its normal meaning as any officer other than a military officer." Schisler, 394 Md. at 613, 907 A.2d at 231 (Harrell, J., concurring and dissenting).

In a dissenting opinion, Judge Lynne A. Battaglia opined, in pertinent part, that the statute's amendment did not violate the separation of powers doctrine because the appointment and removal of statutory officers is not exclusive to the Governor and "is

_____

[5]As to this point, in his concurring opinion, Judge Wilner stated that he differed from Judge Harrell because he did not think that the Court "can so neatly parse [the section of the bill at issue], finding the firing of the incumbent [Public Service] Commissioners to be valid but not the method of their replacement. It is the entirety of the legislative assault that runs afoul of Article 8." Schisler, 394 Md. at 605, 907 A.2d at 226 (Wilner, J., concurring).

- 32 -

entirely subject to the authority of the General Assembly." Id. at 615, 907 A.2d at 232

(Battaglia, J., dissenting). Judge Battaglia explained:

> [T]he gubernatorial powers enumerated in Sections 1, 9, and 15, Article II
> do not divest the [General Assembly] of its power to create, control, modify,
> and abolish any office which it has created. To the contrary, this Court has
> consistently said that the power to appoint and remove civil officers is not
> inherently executive, not even with respect to the Governor's own
> appointees, but also may be exercised by the [General Assembly] if the office
> itself is a legislative creation. The [Public Service Commission] is an
> example of such an office, and therefore, the [General Assembly] has the
> power to regulate fully [the Public Service] Commissioners, a power which
> includes the ability to fire them.

Id. at 631-32, 907 A.2d at 242 (Battaglia, J., dissenting). Judge Battaglia also disagreed

that the Public Service Commission members were "civil officers" for purposes of Article

II, § 15, stating that, under this Court's jurisprudence, "it is highly doubtful that the [Public

Service Commission] Commissioners are civil officers for purposes of" Article II, § 15

where "they are not vested with a portion of the [S]tate's sovereignty to individually act

for the public good[.]" Id. at 615, 631, 907 A.2d at 232, 242 (Battaglia, J., dissenting).

### Mode of Appointment

Article II, § 10 of the Maryland Constitution provides:

> [The Governor] shall nominate, and, by and with the advice and consent of
> the Senate, appoint all civil and military officers of the State, whose
> appointment, or election, is not otherwise herein provided for, unless a
> different mode of appointment be prescribed by the Law creating the office.

We have observed that, under Article II, § 10, when the General Assembly "has

created an office by Act of Assembly, the [General Assembly] can designate by whom and

in what manner the person who is to fill the office shall be appointed." Comm'n on Med.

Discipline v. Stillman, 291 Md. 390, 409, 435 A.2d 747, 757 (1981) (citation and internal

- 33 -

quotation marks omitted).  Thus, "[w]here the office is of legislative creation, the [General Assembly] can modify, control or abolish it, and within these powers is embraced the right to change the mode of appointment."  Id. at 410, 435 A.2d at 758 (citation omitted).

In Calvert Cnty. Comm'rs v. Monnett, 164 Md. 101, 104-05, 164 A. 155, 156 (1933), we stated:

> It is true that a distinction is drawn for some purposes between offices of legislative creation and offices specified in the Constitution and created by it, but it is drawn for some purposes only, not for all.  Generally, the distinction is one of the location of the power of creation; the power to create has been found to include the power to alter or abolish.  Where the office is of legislative creation, the [General Assembly] can modify, control or abolish it, and within these powers is embraced the right to change the mode of appointment.  But that rule cannot apply to an office created by the Constitution, which directs how it shall be filled, fixes the term, and provides for the removal of the incumbent.  And when offices of legislative creation are filled, the incumbents may come within comprehensive provisions of the Constitution.

(Citations and internal quotation marks omitted).

## Analysis

Here, we hold that the circuit court erred in issuing the preliminary injunction because Chapter 35 does not violate Article II, § 15 of the Maryland Constitution or Article 8 of the Declaration of Rights, but rather restructures or reconstitutes the Nominating Commission and prospectively changes the appointment process to grant the appointment power to specified entities other than the Governor; that the Appointees' terms were terminated as part of the restructuring is permissible.

We begin our analysis by examining the components of Schisler—namely, the plurality's determination and the conclusions reached by other judges in the case.  This

analysis demonstrates that the Court was in accord that the General Assembly has the authority to end the terms of gubernatorial appointees to statutory boards or commissions. In Schisler, 394 Md. at 598, 907 A.2d at 222, the plurality stated that, under proper circumstances, the General Assembly is authorized to "effectively terminate the tenure of civil officers not having a fixed Constitutionally-set term[,]" explaining: "If the General Assembly chooses to abolish or reconstitute the Public Service Commission or any other statutory board or commission, it is competent to do so, even if the effect of that abolition or reconstitution would be the shortening or ending of existing terms of incumbent members." In his concurring opinion, Judge Wilner differed from the plurality only to the extent that he did "not believe that . . . ending prematurely the terms of the incumbent members of the Public Service Commission[ ]of itself violate[d] Article II, § 15 of the Constitution." Schisler, 394 Md. at 605, 907 A.2d at 226 (Wilner, J., concurring). And in the concurring and dissenting opinion that Judge Raker joined, Judge Harrell stated that the General Assembly "possesses the power to modify the terms of service of the incumbent members . . . so as to terminate their service as of" a certain date. Id. at 606, 907 A.2d at 227 (Harrell, J., concurring and dissenting). Finally, in her dissenting opinion, Judge Battaglia stated that "this Court consistently has iterated that the Executive does not have the inherent power of appointment and, most importantly, that the [General Assembly] has the power to abolish, modify and control any office that it has created[,]" and that the General Assembly "has the power to regulate fully its [Public Service] Commissioners, a power which includes the ability to fire them." Id. at 628, 632, 907 A.2d at 240, 242 (Battaglia, J., dissenting).

In other words, careful examination of the opinion reveals that, in <u>Schisler</u>, all seven of the judges of this Court agreed that the General Assembly can end early the terms of incumbent members of a commission, regardless of who they are appointed by. Although the plurality concluded that the early ending of terms must be incidental to an abolishment or reconstituting of the commission, Judges Wilner, Harrell, Raker, and Battaglia, despite expressing differing views in their opinions on the issue, would have concluded that no constitutional violation occurs simply by virtue of the circumstance that the terms of the incumbent members of the Public Service Commission were ended early, *i.e.*, that termination of the gubernatorial appointees' terms alone does not violate Article II, § 15.

Applying the rationale of <u>Schisler</u> here, we conclude that termination of the Appointees' terms was incidental to the General Assembly's restructuring and reconstituting of the Nominating Commission, and that, under <u>Schisler</u>, according to a majority of this Court, such action does not rise to the level of a constitutional violation. Here, Chapter 35 did not simply terminate or end early the Appointees' terms. Rather, through Chapter 35, the General Assembly made numerous changes to the structure and function of the Nominating Commission that demonstrate that the General Assembly restructured and reconstituted the Nominating Commission. Particularly, Chapter 35 amended ED (2015) § 3-110(b)(2) by: (1) increasing the number of members of the Nominating Commission from eleven to thirteen, *i.e.*, adding two members; (2) eliminating the Governor's ability to appoint five members; (3) enabling the County Executive of Anne Arundel County to appoint three members instead of one; (4) enabling the Anne Arundel County Council of Parent Teacher Associations to appoint two members instead of one;

and (5) enabling one appointment each by the Anne Arundel County Branch of the National Association for the Advancement of Colored People, CASA de Maryland, the Anne Arundel Special Education Citizens' Advisory Committee, and one among a rotating list of the chambers of commerce of Anne Arundel County. Thus, Chapter 35 increased the overall membership of the Nominating Commission, and reorganized and expanded the appointment authority for new members.

Notably, Chapter 35 also amended ED (2015) § 3-110(b) in other significant ways by: (1) requiring that all members of the Nominating Commission be residents of Anne Arundel County, where no similar provision existed previously; (2) authorizing the members of the Nominating Commission to select their chair from among the members, where previously the Governor designated the chair of the Nominating Commission from among the gubernatorial appointees; (3) providing that the term of the chair of the Nominating Commission would be two years, whereas previously it had been four years; (4) creating an eight-year term limit on membership, where no similar provision existed previously; (5) providing that the School Board is the entity responsible for providing staff to the Nominating Commission, where previously the Department of Legislative Services was responsible for providing staff to the Nominating Commission; (6) providing that a supermajority vote is required for the Nominating Commission to take action, where no similar provision existed previously; (7) prohibiting proxy voting, where no similar provision existed previously; (8) providing that the Nominating Commission must require School Board applicants to include certain information in their applications, where no similar provision existed previously; and (9) requiring the Nominating Commission to

consult the Maryland Judiciary Case Search to verify certain statements made by School Board applicants, where no similar provision existed previously. Overall, Chapter 35 changed the manner in which the Nominating Commission functions by altering its responsibilities and duties, as well as reconstituting the membership of the Nominating Commission and changing the appointment process.

Through Chapter 35, among other things, the General Assembly made numerous significant changes to the Nominating Commission, restructuring the Nominating Commission and altering the appointment process so that, in relevant part, the appointment of members to the Nominating Commission is wholly within the purview of specified entities, and not partly the responsibility of the Governor and partly the responsibility of specified entities, as it was prior to Chapter 35. Going forward, it is accurate that the Governor would have no ability to appoint members to the Nominating Commission, and that, in restructuring the Nominating Commission, the General Assembly terminated the terms of the Appointees early. Under Schisler, 394 Md. at 598, 907 A.2d at 222, however, that the terms of the Appointees were terminated early does not mean that Chapter 35 runs afoul of Article II, § 15 or the separation of powers doctrine where the early termination is incidental to the restructuring or reconstituting of the Nominating Commission. Such is the case here—the termination of the Appointees' terms was attendant to a restructuring of the Nominating Commission. See id. at 598, 907 A.2d at 222 ("If the General Assembly chooses to abolish or reconstitute the Public Service Commission or any other statutory board or commission, it is competent to do so, even if the effect of that abolition or reconstitution would be the shortening or ending of existing terms of incumbent

members.").

Moreover, regardless of whether the members of the Nominating Commission are civil officers under Article II, § 15, we observe that Chapter 35—by restructuring the Nominating Commission to provide for appointments by specified entities and not the Governor, and by terminating the Appointees' terms early—does not violate Article II, § 10 of the Maryland Constitution. Indeed, this Court has historically recognized that, when the General Assembly creates an office by statute, the General Assembly has the authority to designate the mode of appointment to that office. See Stillman, 291 Md. at 409, 435 A.2d at 757. Stated otherwise, where the General Assembly has created the office by statute, the General Assembly "can modify, control or abolish it, and within these powers is embraced the right to change the mode of appointment." Id. at 410, 435 A.2d at 758 (citation omitted). Here, clearly, the Nominating Commission is a legislative creation, and the members of the Nominating Commission are members of the Nominating Commission only because of the enactment of ED (2015) § 3-110(b). As such, the General Assembly is authorized to specify the mode of appointment of members of the Nominating Commission, and may prescribe a different mode of appointment—which is exactly what the General Assembly did in this case through Chapter 35.

To be sure, in restructuring the Nominating Commission and prescribing a different mode of appointment, the General Assembly ended the terms of the Appointees early and did not alter or end the terms of the other members of the Nominating Commission who had been appointed by entities other than the Governor. This, however, is not a unique circumstance. On multiple occasions, the General Assembly has altered the membership

of a statutory board or commission without removing all of the other incumbent members.

For example, through Chapter 739 of the 2016 Laws of Maryland, the General Assembly renamed the State Board of Chiropractic and Massage Therapy Examiners as the State Board of Chiropractic Examiners, and amended Md. Code Ann., Health Occ. (1981, 2014 Repl. Vol., 2015 Supp.) ("HO (2015)") § 3-202 to decrease the number of members of the State Board of Chiropractic Examiners from eleven to seven.[6]  2016 Md. Laws 7509-10 (Vol. IX, Ch. 739, H.B. 1420).  In so doing, the General Assembly provided as follows:

> That, on October 1, 2016, the position on the State Board of Chiropractic and Massage Therapy Examiners held by the longest serving licensed chiropractor member of the Board and the three positions held by the licensed massage therapist members of the Board shall terminate so as to reduce the number of positions on the newly established State Board of Chiropractic Examiners in accordance with § 3-202 of the Health Occupations Article[.]

2016 Md. Laws 7540 (Vol. IX, Ch. 739, H.B. 1420).  In other words, the General Assembly eliminated the positions of four incumbent members of the former State Board of Chiropractic and Message Therapy Examiners while leaving the other seven incumbent members in place.[7]

As another example, through Chapter 265 of the 2014 Laws of Maryland, the General Assembly amended Md. Code Ann., State Gov't (1984, 2009 Repl. Vol., 2013

---

[6]Specifically, HO (2015) § 3-202 provided that the Board consisted of eleven members: six licensed chiropractors, three licensed massage therapists, and two consumer members.  The amendment to HO (2015) § 3-202 changed the composition of the Board to seven members consisting of five licensed chiropractors and two consumer members. See 2016 Md. Laws 7510 (Vol. IX, Ch. 739, H.B. 1420).

[7]Additionally, of note, HO (2015) § 3-202(a)(3)(i) provided that the Governor appoints the chiropractor members of the Board.  As such, Chapter 739 terminated early the term of one of the Governor's appointees to the Board.

Supp.) § 9-803(a) and altered the membership of the Financial Education and Capability Commission "to include the Secretary of Higher Education, or the Secretary's designee, rather than a member of the Higher Education Commission[.]" 2014 Md. Laws 1645 (Vol. II, Ch. 265, H.B. 165). Previously, the Governor had appointed one member of the Financial Education and Capability Commission from the Maryland Higher Education Commission. See id. at 1646. Chapter 265 removed that position, however, and replaced it with the Secretary of Higher Education, or the Secretary's designee. See id. The other members of the Financial Education and Capability Commission remained the same. See id. at 1645-47; see also 2007 Md. Laws 2287 (Vol. III, Ch. 361, S.B. 882) (The General Assembly amended Md. Code Ann., Educ. (1978, 2006 Repl. Vol.) § 13-304(c) to remove the Executive Director of the Maryland Institute for Emergency Medical Services Systems as a voting member of the Board of Directors of the Medical System Corporation, but made no other changes to the voting members or the board's membership.); 2002 Md. Laws 3898-99 (Vol. V, Ch. 499, H.B. 226) (The General Assembly amended Md. Code Ann., Crim. Law (2002) § 13-1104 to alter the membership of the Charles County Gaming Permit Review Board by replacing one member (the member who was to be a member of the clergy) with a new at-large member, but made no other changes to the membership of the Board.).[8] As demonstrated, the General Assembly's alteration of the membership of a statutory board or commission, without removing all incumbent members, it is not a new

---

[8]We note that, in this case, as originally introduced, House Bill 172 would have removed the incumbent member of the Nominating Commission who was appointed by the Annapolis and Anne Arundel County Chamber of Commerce.

or novel idea.  And, the alteration of the membership of the Nominating Commission with the Appointees' terms ending early in no way undermines the circumstance that the General Assembly made broad changes to the function of the Nominating Commission, and the manner of appointment of its members; *i.e.*, ending  the Appointees' terms early was but one feature of the restructuring of the Nominating Commission, and not a singular act.

Before moving on, we are compelled to explain that this case presents circumstances that are vastly different from those presented in Schisler and, thus, results in a different outcome.  In Schisler, 394 Md. at 525 n.9, 907 A.2d at 178 n.9, the legislation at issue terminated the terms of all of the existing members of the Public Service Commission, who had been appointed by the Governor, and called for an interim appointment process by which the President of the Senate and the Speaker of the House would submit lists of names, from which the Governor would need to choose five new members of the Public Service Commission; if the Governor failed to appoint new members, then the President of the Senate and the Speaker of the House were authorized to appoint enough new members for a fully constituted Public Service Commission.  The legislation provided that, after the interim, temporary appointment process, and after the terms of the interim members expired, appointments to the Public Service Commission would resume as it had, with the Governor appointing members with the advice and consent of the Senate.  See id. at 545, 907 A.2d at 190.  In other words, the legislation at issue in Schisler did not involve a restructuring or reconstituting of the Public Service Commission that would implement changes that would apply prospectively to all future appointees to the Public Service Commission, but rather involved the General Assembly wresting authority away from the

Governor and giving itself the one-time authority to submit lists to the Governor and make appointments before reverting back to the old gubernatorial appointment process.

By contrast, in this case, the General Assembly has instituted a variety of changes to the Nominating Commission, including to the composition and number of members; these changes apply prospectively to all future appointees, and restructure the Nominating Commission. Moreover, Chapter 35 does not involve the General Assembly giving itself the power to appoint members to the Nominating Commission or instituting an artificial gubernatorial appointment process before returning to a prior appointment process, as was the case in Schisler. Indeed, here, the General Assembly is not involved in the appointment of members to the Nominating Commission; and, the General Assembly has never had the authority to appoint members to the Nominating Commission, either before or after Chapter 35. Stated otherwise, through Chapter 35, the General Assembly did not give itself the power to choose replacements for the Appointees or prevent the Appointees from being reappointed by the other entities. Rather, in restructuring the Nominating Commission, among a myriad of other changes, the General Assembly simply reassigned the appointment power from the Governor to other entities.

Because we hold that Chapter 35 does not violate Article II, § 15 of the Maryland Constitution or Article 8 of the Declaration of Rights, but rather restructures or reconstitutes the Nominating Commission and prospectively changes the appointment process to grant the appointment power to specified entities other than the Governor, and that the Appointees' terms were permissibly terminated as a result of the restructuring, we need not address whether members of the Nominating Commission are civil officers under

Article II, § 15.  Stated otherwise, because we conclude that Article II, § 15 of the Maryland Constitution, which applies to military officers and civil officers, has not been violated, whether members of the Nominating Commission are civil officers in the first instance is not dispositive of the case.  In sum, we hold that there is no separation of powers violation in this case and that the circuit court erred in issuing the preliminary injunction.  Chapter 35 does not violate Article II, § 15 of the Maryland Constitution or Article 8 of the Declaration of Rights, but rather restructures the Nominating Commission, a result of which is the termination of the Appointees' terms.  Accordingly, we reverse the circuit court's judgment.

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. APPELLEES TO PAY COSTS.**